Commonwealth *v.* Bryant, Appellant.

Argued November 20, 1950. Before DREW, C. J., STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

*Edwin P. Rome,* with him *W. Bradley Ward,* for appellant.

*Colbert C. McClain,* Assistant District Attorney, with him *John H. Maurer,* District Attorney, for appellee.

OPINION BY MR. JUSTICE JONES, March 21, 1951:

Edward J. Bryant, the appellant, was jointly indicted for murder along with one Joseph Chambers. He was tried separately and convicted of murder in the first degree with the penalty fixed at death. On

this appeal from the judgment and sentence, he assigns for error the action of the court below in receiving in evidence at trial oral and written statements which he had made to interrogating police officers, while in custody after his arrest, without having been advised of his right to counsel or of his privilege against self-incrimination. There is no suggestion that the statements were the product of any coercion or inducement practiced upon the accused. Nor did he repudiate them or otherwise impugn them such as by charging incommunicado restraint or debilitating questioning.

It is the appellant's contention that, despite the absence of any evidence of coercion in connection with his making the incriminating statements, ". . . the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States and of Article I, Section 9 of the Constitution of Pennsylvania require, at least in a capital case, that an accused from the moment of his arrest be informed of his right to counsel and of his privilege against self-incrimination and, absent some intelligent waiver on his part following his being informed of his right to counsel, that the accused be furnished counsel. The corollary of this requirement is that the deprivation or denial of these rights renders inadmissible any evidence secured thereby from the accused."

Nowhere does it appear that the defendant requested counsel and was *refused* or that he expressed a desire to remain silent but was *compelled* to answer. The most that can be said in such connection is that the police officers did not inform him of the rights to which he now lays claim. He was, however, informed of the nature of the charge for which he was arrested, was cautioned that anything he said might be used against him at trial and was given a prompt prelimi-

nary hearing upon being returned to Pennsylvania.

The following are the material facts. Late in the afternoon of November 8, 1948, Joseph Saturno, sixty-five, was found bloody and unconscious in his first-floor three-room apartment in South Philadelphia where he lived alone. His condition was the result of an extremely brutal beating which he had received, unwitnessed, save by the perpetrators. He was promptly removed to a hospital where he died several hours later without having regained consciousness. There were evidences from the condition of the apartment and the victim's clothing indicating that robbery was the motive of the culprit or culprits. Within an hour or two of the discovery of the crime, the police arrested Chambers, Bryant's co-indictee, who lived but a short distance from the victim's apartment. From information received from Chambers, the police sought Bryant as a suspect but were unable to find him; a search of Chambers' house, where Bryant had been living, failed to uncover him.

A month later (December 8th), Bryant was arrested by the police of Newark, New Jersey, for an offense committed there and was promptly identified by his finger prints as the person wanted in Philadelphia for the murder of Saturno. The police of the latter city were at once notified of Bryant's apprehension and two detectives from Philadelphia went to Newark the same day. There, in the presence of a local officer in the Newark detective headquarters, they interviewed Bryant after having informed him that he was wanted in Philadelphia for murder. Bryant related that he and Chambers, at the latter's suggestion, had gone to Saturno's apartment on the afternoon of November 8th for the purpose of robbing him of money which Chambers claimed to have seen Saturno exhibit earlier that day; that Chambers slugged Saturno into uncon-

sciousness and repeated the sordid performance (ulti-
mately with a blackjack he had picked up in the apart-
ment) each time the victim showed signs of reviving;
that, in the meantime, the two of them had searched
Saturno, removing his shoes, socks and outer clothes
for the purpose, and had ransacked bureaus and
drawers, turning things topsy-turvy, in their quest for
hidden money; that he (Bryant) had not struck
Saturno; that, at Chambers' direction, he had left
before the robbery was completed and had gone back
to Chambers' house; and that, when Chambers returned
there, he told Bryant, upon the latter's inquiry, that
he had not gotten anything from Saturno or his apart-
ment,—an assertion which Bryant did not accredit.
After Bryant had made this oral statement to the
Philadelphia detectives, they returned home the same
day, leaving the prisoner in the custody of the Newark
police.

The Philadelphia officers went back to Newark on
the afternoon of December 10th and returned with
Bryant to Philadelphia where they arrived about 6
p.m. that evening. They took him to the central police
station in City Hall where they obtained from him a
statement in question-and-answer form which one of
the detectives typed. The preliminary questions asked
by the detective and answered by Bryant, as shown by
the statement, were as follows: "Q. What is your name,
age and address? A. My name is Edward J. Bryant; I
am 25 years of age, and my home is 218 Bailey Street,
Steelton, Pennsylvania. Q. Do you know why you have
been placed under arrest? A. Yes; for murder. Q. Are
you willing to tell us your part in this murder? A. Yes,
sir. Q. Have you been threatened in any way? A. No,
sir. Q. Have any promises been made to you, in order
to give this statement? A. No, sir. Q. We warn you
at this time that anything that you tell us in this

statement can and will be used as evidence against you at the time of your trial in court. Do you understand that? A. Yes, sir. Q. Will you go on then in your own way and tell us all that happened?" Bryant then related in detail substantially what he had told the detectives on December 8th in Newark as above recited. When the statement was completed, the accused signed it on each of its two pages.

Bryant was housed in the central police station overnight; next morning, he was given a hearing on the murder charge before a magistrate who forthwith committed him to jail to await action of the grand jury. He was indicted for murder on January 12, 1949, was arraigned on January 14, 1949, and pleaded "Not Guilty", being then represented by the public defender. Through the latter, Bryant at once moved for a continuance of the trial which was granted. At the same time, he made an affidavit of destitute circumstances and requested the court to assign him counsel which the court did four days later (January 18, 1949), appointing to defend him the experienced counsel who since then have at all times ably represented him. The trial was begun May 4, 1949, and ended two days later with the jury's verdict as already stated.

At trial, one of the detectives was permitted to testify, over counsel's objection, as to the oral statements made by the accused while in custody in Newark, New Jersey; and the other detective was permitted to read in evidence, likewise over counsel's objection, the written statement signed by the accused in the central police station in City Hall, Philadelphia, on December 10, 1948, upon his return from Newark. The defendant did not take the witness stand; nor did he offer any evidence.

Our independent review of both the law and the evidence in its entirety, as required by the Act of Feb-

ruary 15, 1870, P. L. 15, Sec. 2, 19 PS §1187, impels the firm conclusion that the ingredients of murder in the first degree were proven to exist. The homicide, having been committed in the perpetration of a felony, was murder at common law and, consequently, murder in Pennsylvania and, the felony being robbery, the murder was murder in the first degree under our statute: Act of June 24, 1939, P. L. 872, Sec. 701, 18 PS §4701. But, as the statements made by the accused to the detectives were vital to the establishment of his guilt, we have, then, to consider whether the statements were properly admitted in evidence.

Article I, Section 9 of the Pennsylvania Constitution, upon which the appellant relies in part, provides that "In all criminal prosecutions the accused hath a right to be heard by himself and his counsel . . .; he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land." These provisions in our present Constitution of 1874 have been successfully carried forward, in substance, from the Commonwealth's first Constitution of 1776 following the Declaration of Independence.[1]

While the right to assistance of counsel, on the part of one accused of crime, is, and has been, thus constitutionally recognized and confirmed in this State, that provision has never been held to impose upon an arresting police officer, or anyone else for that matter, a duty to inform an accused, *from the moment of his arrest,* of his right to counsel. Certainly, the constitutional provision does not, in terms, impose an obligation upon another to make such rights known to

---

[1] See Pennsylvania Constitution of 1776, Section IX; Constitution of 1790, Art. IX, Sec. 9; and Constitution of 1838, Art. IX, Sec. 9: Thorpe, American Charters, Constitutions and Organic Laws, Vol. 5, p. 3081 et seq.

an accused. Nor is the constitutional right to assistance of counsel to be confused with the right of a destitute defendant, charged with murder, to counsel by court assignment at public expense. The latter provision obtains with us by virtue of legislative direction: Act of March 22, 1907, P. L. 31, Sec. 1, 19 PS §784.[2] By the terms of the 1907 Act, the right to assigned counsel at public expense in the case of a person charged with murder does not accrue until the accused is *under indictment*. Under the predecessor statute, relating to court-assigned counsel for accused in capital cases (Act of May 31, 1718, 1 Sm. L. 105, Sec. IV, to which the Act of 1907, supra, is supplementary), it was ". . . *upon all trials* of the said capital crimes" that the right to assigned counsel initially attached (Emphasis supplied).[3] The Act of 1907 is not an implementation of the constitutional right to assistance of counsel under Article I, Section 9 of the State Constitution. That provision is applicable to "all criminal prosecutions" whereas the assignment of counsel, authorized by the Act of 1907, is limited to cases of destitute persons charged with murder. The statutory provision stems not from the constitutional right to assistance of counsel but from an appropriate regard for an essential of due process where one in need of counsel is on trial for his life. And, with us, the statutory provision with respect to the time of the ap-

---

[2] By amendment of April 6, 1949, P. L. 406, Sec. 1, 19 PS §784, Pkt. Part, the compensation to assigned counsel, not exceeding two, was increased from $200 each to $500 each in addition to "all personal and incidental expenses."

[3] It is of interest, in passing, that, under the Act of 1718, supra, which occupied the field of assigned counsel in capital cases exclusively until the passage of the Act of 1907, supra, counsel served, when called upon by the court, as a professional duty without compensation.

pointment of such counsel, i.e., when the accused is "under indictment", has been deemed to constitute compliance with the constitutional requirement of due process so far as the time of assignment of counsel to an accused is concerned. Of course, if one under arrest for *any* criminal offense (murder, no less) should ask for counsel and be refused leave to obtain such representation, that would raise a different question of infraction of a constitutional right: see *Commonwealth v. Jones*, 341 Pa. 541, 548, 19 A. 2d 389; *Commonwealth v. Spardute*, 278 Pa. 37, 46, 122 A. 161. But, no such question is here involved. Counsel was neither requested by, nor denied, the defendant.

The admission in evidence of a confession obtained from an accused while he is in custody and uncounseled and without his having been affirmatively advised of his privilege against self-incrimination does not, *ipso facto*, violate the due process clause of Article I, Section 9 of the State Constitution. The admissibility of confessions has been adjudged in this State on their evidentiary trustworthiness according to the circumstances and conditions attending their rendition. Such is the rule generally: see Wigmore, Evidence, Vol. III (3rd Ed.), §822. If a confession is voluntary, it is admissible in evidence but not if it is coerced. In *Commonwealth v. Charles Mosler*, 4 Pa. 264, 265, Chief Justice GIBSON of this court, along with Justices COULTER and BELL, sat, more than a century ago, in the Oyer and Terminer Court of Philadelphia County for the trial of a defendant on an indictment charging him with murder. It appears that,—"In the course of the trial, the attorney-general proposed to ask a witness what the prisoner had said to him immediately after the witness had told the prisoner that he must consider himself under arrest. This was objected to by the prisoner's counsel, on the ground that the con-

fessions of a prisoner while in custody are not admissible as evidence." In a per curiam opinion, apparently written by the Chief Justice, the question was ruled as follows: "Cases on the statutes of Philip and Mary, or on the 7 Geo. 4, c. 64, which has supplanted them, are inapplicable to a confession made to an officer who has the prisoner in custody. . . . But in no case has it been ruled, that such a confession must be preceded by an admonition to put the prisoner on his guard. . . . Considerable experience in criminal trials, at one period of my life, enables me to say that thus the law has been held in Pennsylvania. The arrest of the prisoner without warrant was undoubtedly legal; but no advantage was taken of the predicament in which he stood. Indeed, he had voluntarily confessed the perpetration of the act before he was arrested; and the subsequent inquiry by the witness, who had him in charge, had regard only to the circumstances. Whatever he said in reply to the question thus put, may undoubtedly be given in evidence to affect him." On the other hand, if a confession is the result of coercion or inducement practiced upon the accused, it is without probative value and therefore inadmissible in evidence. Whether a particular confession is less than voluntary, in other words, is the product of a will dominated by fear or falsely inspired hope, usually depends on issues of fact which are for the jury to resolve. But, where the evidence as to the will-destroying or will-impairing influences exerted upon the confessor are undenied or are otherwise competently established, the inadmissibility of the confession presents a question of law for the court's summary disposition.

In judging of the voluntariness of confessions, certain pertinent principles have been enunciated in our prior decisions. In *Commonwealth v. Agoston*, 364 Pa. 464, 483, 72 A. 2d 575, cert. den. 340 U. S. 844, the

late Chief Justice MAXEY recognized for this court that,—"The fact that the confessor is in custody and has no counsel does not invalidate a confession made by him." *Commonwealth v. Spardute,* supra, at p. 47 quoted from Underhill on Criminal Evidence, 2nd Ed., sec. 129, p. 249, to the effect that "The mere fact that the defendant was under arrest, or was in the charge of armed police officers when he made his confession, will not make a confession involuntary." *Commonwealth v. Jones,* supra, quoted similarly and stated further on the authority of the *Spardute* case, supra, —"Nor are the [accused's] statements invalidated by reason of the fact that [he] was not represented by counsel, no request for such representation ever having been made." In *Commonwealth v. James,* 294 Pa. 156, 161, 143 A. 910, this court said with respect to the complaint there made of the admission in evidence of a confession,—"The only basis [of complaint] is that when it was made defendant was confined in the barracks of the state police and that he had been questioned by the state officers for a considerable period of time. This could not invalidate the confession [citing cases]. No evidence of threats, compulsion or anything else indicating impropriety in obtaining it appeared. Defendant did not challenge it by his own testimony. The evidence of the officers showed that it was voluntarily made." See also *Commonwealth v. Cavalier,* 284 Pa. 311, 315, 131 A. 229, where it was held that the confession was not invalidated because "it was uttered to policemen who were investigating the crime. . . ." The situation is well described in *Commonwealth v. Eagan,* 190 Pa. 10, 21, 42 A. 374, where the following was aptly observed,—"It is the manner and circumstances under which a confession is procured, not the person to whom it is made, that determines its admissibility. The motive of the confession

is plain. 'Conscience doth make cowards of us all.' Two confederates, starting out to commit burglary end in doing murder, and being arrested, each in his cowardly haste to throw the burden of the actual killing on the other, makes a confession that incriminates himself." The foregoing is peculiarly apposite here in the light of the conflict between Bryant and his confederate, Chambers, whose appeal from his conviction of first degree murder was argued before us at the same time.

The privilege against self-incrimination is a restraint upon judicial interrogation of one charged with crime. So long as statements by a suspect or an accused, made extrajudicially, are wholly voluntary, their admission in evidence against him later does not violate the constitutional privilege of remaining mute to relevant questions. Such a person has not been *compelled* to give evidence against himself. For an interesting discussion of the historical background and purpose of the privilege, see Wigmore, Evidence, Vol. VIII (3rd Ed.), §§2250, 2251 and 2252, p. 276 et seq. The rule was designed to curb the judicial bully of the Star Chamber and High Commission type whose evident aim, too often, was to confound the innocent to secure their predetermined convictions. But, no valid reason suggests itself why a suspect should not be bound by what he freely tells investigating officers concerning the commission of a crime. Yet, the appellant argues that, wholly apart from the specific privilege against self-incrimination, it is a violation of due process to allow a suspect to tell willingly to interrogating police what he knows of the crime, for which he is under arrest, *until* he has been provided with counsel or has intelligently waived counsel and has been advised of his right to remain silent.

While due process does indeed require the protection of an accused against any unfair advantage, it has never been held to require his protection against his own natural desire to unburden himself. The tendency of criminal offenders to talk from no other compulsion than their own guilty consciences is a well-known psychological fact. The extent of requisite protection to an accused in such a frame of mind was well defined in *Commonwealth v. Bolger,* 229 Pa. 597, 601, 79 A. 113, where this court affirmed, per curiam, a judgment of the Superior Court on the opinion of Judge HEAD which contained the following pertinent language: "There is no law, natural, civil or moral, which forbids to a criminal the right to divulge his guilty secret, and thus perhaps best begin the work of his own reformation. But out of our knowledge that innocent men are sometimes accused, and our conception of the dignity and self-respect which ought to characterize the conduct of the government of a great people, even in the detection and punishment of crime, has been born the principle that one accused must not be *compelled* to help in bringing about his own conviction" (Emphasis supplied). While that was said in a noncapital case, the standard of fair play there expressed is of such caliber as to meet the most exacting requirements for an accused's proper protection in a capital case.

No rights of the appellant under the State Constitution were violated by the police officers in obtaining from him, in the circumstances described, his statements concerning the murderous assault on Saturno. It is undenied that the statements were made freely and voluntarily by the accused without compulsion or inducement from threats or promises and with knowledge that what he said might be used against him at trial. Under our decisions, the statements were proper-

ly admitted in evidence. And, nothing else is assigned for error. The case was submitted to the jury by the learned trial judge in a charge that was eminently fair and impartial and to which the defendant took no exception.

We come, then, to the ultimately controlling question,—Did the admission in evidence of the incriminating statements which the defendant made to the police in the circumstances related violate due process under the Fourteenth Amendment of the Federal Constitution?

As we read the opinions for the Supreme Court, that question must be answered in the negative. The crucial circumstances in *Watts v. State,* 338 U. S. 49, which rendered admission in evidence of the elicited confessions in that case a denial of due process was that they were the product of sustained pressure and persistent interrogation by the police. In *Turner v. Commonwealth of Pennsylvania,* 338 U. S. 62, the disqualifying conditions were the subjection of the accused to a long process of police questioning in patent violation of his right to a prompt preliminary hearing which had been designedly withheld until interrogation produced confession. The mention in the *Turner* case of non-access to the accused on the part of friends and relatives accentuated the incommunicado character of the restraint; and the materiality of the failure to advise him of his right to remain silent lay in the fact that the undue antecedent inquiry could not have been accomplished otherwise. In *Harris v. State of South Carolina,* 338 U. S. 68, use of the confession as evidence against the accused was violative of due process because the confession had been wrung from him through long and exhausting hours of interrogation by panels of five to six police officers, working in relays to allow *them* respite from the stifling heat of

the cubicle in which the questioning was conducted; and the accused, who throughout the inquisition had denied his guilt of the killings charged to him, finally yielded in his worn-down state when the officers cunningly threatened to arrest his mother. The fact that the accused had not been informed of "his rights" was merely added aggravation of the otherwise unconstitutional character of the gruelling to which he had been subjected.

We believe that, without exception in the Supreme Court cases, the circumstances which have invalidated confessions as being in violation of the due process clause of the Fourteenth Amendment have been such as justly impelled conclusions that the confessions were the result of coercion, physical or mental, and were not the free and voluntary acts of the accused. In no instance was failure to inform the accused of his right to secure counsel and to remain silent any more than an additional, and not a solely controlling, incident. Thus, in *Haley v. Ohio,* 332 U. S. 596, the police officers' disregard of the standards of constitutional decency in their questioning of the accused was ". . . *underlined* by the fact that he was kept incommunicado for over three days during which the lawyer retained to represent him twice tried to see him and twice was refused admission" (Emphasis supplied). It is when "confessions [are] extorted" that attendant circumstances, such as being "unlawfully held incommunicado without advice of friends or counsel", take on significance: see *Ward v. Texas,* 316 U. S. 547, 555. In *White v. Texas,* 310 U. S. 530, 531 (on petition for rehearing of the same case in 309 U. S. 631), the fact that the accused ". . . was not permitted to talk to an attorney to advise him . . ." received no more notice than a footnote reference. In other of the germane Supreme Court cases where convictions in State courts

were reversed because based on confessions obtained in circumstances violative of due process, it is obvious from the reports that counsel for the accused could not possibly have been present at the time of the confessions yet the absence of counsel was not even mentioned as a determinative factor in the decisions: see *Ashcraft v. Tennessee*, 322 U. S. 143; *Chambers v. Florida*, 309 U. S. 227; and *Brown v. Mississippi*, 297 U. S. 278. See also State reports, cited below, of convictions reversed by the Supreme Court for want of due process on the assigned authority of *Chambers v. Florida*, supra, in the following memoranda decisions: *Lomax v. Texas*, 313 U. S. 544 (144 S. W. 2d 555); *Vernon v. Alabama*, 313 U. S. 547-548 (200 So. 560); and *Canty v. Alabama*, 309 U. S. 629 (191 So. 260).

On the other hand, we know of no decision of the Supreme Court which has excluded the use of a confession as a violation of due process simply because the confessor had not been priorly advised by his interrogators of his right to counsel or of his privilege against self-incrimination. The rule that the evidentiary criterion for adjudging the admissibility of an extrajudicially obtained confession is its testimonial trustworthiness has been federally applied: see *Wilson v. United States*, 162 U. S. 613, 622; and *Ziang Sung Wan v. United States*, 266 U. S. 1, 14. At the same time, it is also to be recognized that the circumstances attending the making of a confession may be such as to impeach its integrity, as a matter of law, even though its contents be otherwise proven credible and that, in such instance, its use as evidence will be stricken down as a denial of federal due process: cf. *Lisenba v. California*, 314 U. S. 219, 236. But, the mere fact that a confession is made as a result of police questioning, while the accused is in custody, is not of itself a constitutionally vitiating circumstance: see e.g., *Ziang*

*Sung Wan v. United States,* supra, at p. 14; cf. also *McNabb v. United States,* 318 U. S. 332, 346. In the *McNabb* case a federal prosecution was involved, but, as that case plainly indicates, the Supreme Court standard of due process required of the States is, at least, no stricter than that required of subordinate federal courts. In *Lyon's v. Oklahoma,* 322 U. S. 596, 599, the use of a confession in evidence was held not to violate due process under the Fourteenth Amendment although ". . . counsel was not supplied [the accused] until *after* his preliminary examination, which was subsequent to the confessions" (Emphasis supplied). As in the instant case, the prisoner was ". . . competently represented before and at the trial . . . ." In the *Lisenba* case, supra, use of the confession was held not to have worked a denial of due process even though the accused had specifically requested counsel before he was subjected to crucial interrogation by the police and counsel was *not* summoned. It seems implicit in *Powell v. Alabama,* 287 U. S. 45, 71, that assignment of counsel for an accused in a capital case is timely, within the due process requirements of the Fourteenth Amendment, if not made ". . . at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case." In the present instance the defendant had counsel from the time of his arraignment onward. Nor does he make any complaint in such regard. His contention is that he should have been supplied counsel at the moment of his arrest and before the police officers asked him any questions concerning the crime they were investigating.

The recognized limit of Supreme Court review of State convictions was well expressed in *United States v. Mitchell,* 322 U. S. 65, 68. True enough, the statement was a dictum (a federal conviction being there

involved), but, appearing as it does in an opinion for a majority of the Court's full membership, it may fairly be taken as interpretive of the Court's view of its own pertinent decisions. It was there said (p. 68) with respect to such review,—"Our sole authority is to ascertain whether that which a state court permitted violated the basic safeguards of the Fourteenth Amendment. Therefore, in cases coming from the state courts in matters of this sort, we are concerned solely with determining whether a confession is the result of torture, physical or psychological, and not the offspring of reasoned choice."

It is our opinion that the statements of the appellant to the police, made in the circumstances as hereinbefore related, were voluntary and uncoerced and that their use as evidence against him at trial did not violate the due process clause of the Fourteenth Amendment.

Judgment and sentence affirmed.