Commonwealth *v.* Johnson, Appellant.

Argued November 10, 1952. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*H. Lester Haws*, with him *Robert W. Honeyman*, for appellant.

*Bernard E. DiJoseph*, Assistant District Attorney, with him *J. Stroud Weber*, District Attorney, for appellee.

Opinion by Mr. Justice Chidsey, January 5, 1953:

Upon each of two indictments James Morris Johnson was convicted by a jury of murder in the first degree with penalty fixed at life imprisonment. His motions for new trial and in arrest of judgment were dismissed and this appeal is from the judgment and sentence imposed in accordance with the verdict.

This was defendant's second trial. At his first trial he was convicted of murder in the first degree with penalty of death but upon appeal this Court set aside the conviction for trial errors and awarded a new trial: (*Commonwealth v. Johnson*, 368 Pa. 139, 81 A. 2d 569).

The defendant was indicted under Section 919 of The Penal Code of June 24, 1939, P. L. 872, which provides, *inter alia*, that whoever wilfully and maliciously removes or displaces any rail of a railroad, is guilty of felony, and in every case where the life of a human being is destroyed by, or as a result of any of such acts, the offender "shall be deemed guilty of murder in the first degree".[1]

The facts in the case are summarized in the opinion of the Court in the prior appeal, but they will be recounted and amplified here: On May 9, 1948 at 8:55 p.m. (Eastern Daylight Saving Time), a passenger train of The Reading Company consisting of an engine, tender, baggage car and four coaches, was proceeding eastwardly from Allentown, Pennsylvania to Philadel-

[1] In accordance with the ruling by the majority of this Court in the first appeal by this defendant that Section 919 of The Penal Code of 1939 must be read in connection with the provisions of Section 701, the trial judge instructed the jury that they could find the defendant guilty of second degree murder.

phia on the southernmost of four tracks, and became derailed and wrecked at a point in Montgomery County about one and one-third miles east of Valley Forge Station, and approximately midway between that station and the next station to the east, Port Kennedy. The engineer and fireman of the train were killed and it was with their deaths that the defendant was respectively charged in the two indictments. An investigation disclosed that a section of the track at the point mentioned had been tampered with and a number of spikes and tie plates removed from the rail; the window of a railroad tool house about a mile distant from the scene of the wreck had been broken into and a wrench and a tool described as a claw-bar were missing. Because defendant had been convicted in 1940 in the State of Delaware of the crime of "obstructing a railroad", suspicion was directed toward him. He had been sentenced there to a term of ten years in prison but released after serving seven years. In November, 1948 he was located in Edgefield, South Carolina. On November 7th, Pennsylvania police authorities went there and found that he had been picked up by a State Policeman for a traffic violation and was being held in jail for illegal entry. One of the officers from Pennsylvania, Lieutenant Smith of the Reading Police, possessed a warrant for the defendant, issued out of Chester County, Pennsylvania, for a violation of parole. The local South Carolina authorities surrendered their custody of the defendant who then willingly returned by train to Pennsylvania with the officers, the party arriving at Philadelphia on November 9th. En route the officers inquired of defendant as to his whereabouts on May 9, 1948, the date of the train wreck. He told the officers that he had been in Pocomoke City, Maryland the morning of that day and had spent the night in Middletown, Delaware. To

check the accuracy of the defendant's statements, on the next day, November 10th, three of the officers went with the defendant by automobile to Middletown, Delaware. The defendant's statement as to his whereabouts was not substantiated. The party motored back the same day to Norristown, Pennsylvania where defendant admitted tearing up the track. The following day, November 11th, he was taken to the district attorney's office where, after questioning by the district attorney, he signed a statement admitting the displacement of the rail. This statement was taken stenographically in question and answer form, each page of which the defendant signed after making two corrections in his own handwriting. The following day, in the company of police officials and representatives of the public press, he went to the place where the train was wrecked and reenacted the crime. Upon returning to the district attorney's office, he made a second statement upon questioning by the district attorney which was taken down stenographically in question and answer form, each page of which he also signed. On November 13th the defendant was given a preliminary hearing on the charge of murder. He did not deny the charge but wanted to know why he was to take the blame when there were supposed to be "two or three other fellows" involved. In his first written statement defendant indicated that he had accomplices. When questioned after the preliminary hearing, he stated that he could not recall the names of these alleged accomplices. The Commonwealth claimed he alone had perpetrated the crime and conjured up the story of accomplices to minimize its enormity.

In support of this appeal appellant makes several contentions: (1) that his convictions were not obtained in accordance with due process of law and were therefore invalid; (2) that the trial court erred in admitting

into evidence prior convictions to aid the jury in determining the penalty where a verdict of murder in the first degree might be rendered; (3) if such prior convictions were admissible, they were not properly proven; (4) the learned trial judge erred when he charged the jury that there is no obligation to warn an individual of his constitutional rights where he has not been charged and there is no legal proceeding pending; (5) that the verdict of murder in the first degree with penalty of life imprisonment was not predicated upon legally sufficient and competent evidence.

(1) Considerably more testimony was adduced by both the Commonwealth and the defendant at his second trial, but after a searching scrutiny of the record we can repeat as applicable to defendant's first contention on this appeal much of what was said in the opinion of the Court in the earlier appeal (368 Pa. 139): "Defendant does not deny that his return to Pennsylvania with the police officers was voluntary on his part; he merely testified that his motive was to escape punishment in South Carolina on the charge there pending against him. Neither does he claim that his confessions were not voluntary; he merely testified that they were not true. The [written] confessions were made, one the day after, the other the second day after, his return. He knew he was being questioned by officers of the law and he was informed, before he made either statement, that what he said could be used against him. . . . There was no interrogation so protracted or prolonged as to amount to mental or physical coercion or duress. The court did, however, submit to the jury the question whether the confessions were the voluntary acts of defendant and instructed them that they should consider whether there was any corroborating evidence confirmatory of their truth. Defendant was given a hearing before a magistrate on

the fourth day after his return to Pennsylvania; such a delay cannot be adjudged a denial of due process." See *Commonwealth v. Shupp,* 365 Pa. 439, 75 A. 2d 587.

Appellant now argues that his oral and written confessions were not admissible because made when he was detained in alleged unlawful custody. It was the defendant who developed the fact that one of the officers was armed with a warrant for the defendant's apprehension because of a parole violation in Pennsylvania. But even if his detention was illegal, this would not of itself invalidate his confessions: *Commonwealth v. Turner,* 371 Pa. 417, 88 A. 2d 915. This also sufficiently answers appellant's contention that extradition proceedings were required. The pertinent provision of the Uniform Extradition Act of July 8, 1941, P. L. 288, Sec. 26, 19 PS §191.26, in this regard is: ". . . That nothing in this section shall be deemed to limit the rights of the accused person to return voluntarily and without formality to the demanding state, nor shall this waiver procedure be deemed to be an exclusive procedure or to limit the powers, rights or duties of the officers of the demanding state or of this State.". One of the officers testified that when the defendant was first taken into custody in South Carolina he was advised that he could refuse "to be extradited" or could "waive extradition". However this may be, the defendant at no time during either of his trials denied willingness to accompany the officers, and this includes the interim trip made by him and the officers to Maryland to check on his claimed whereabouts on May 9, 1948, the date of the crime.

Appellant also argues that his confessions were obtained through trickery and artifice in that he was not told of the deaths resulting from the displacement of the rail. It may be he might not have told what he did had he known of the deaths, but this does not af-

fect or detract from the truthfulness of his admission that he displaced the rail. It is not claimed that the police officers or the district attorney made any misrepresentations to him concerning the facts and circumstances surrounding the crime. The complaint is that the defendant was not told of the seriousness of the offense as to which he was being questioned in the district attorney's office. Even if this were deemed artifice, it manifestly was not designed or calculated to obtain an untrue confession; according to the testimony of two of the police officers, the defendant prior to the written confessions made at the district attorney's office, volunteered that he had displaced the rail. "The object of evidence is to get at the truth, and a trick which has no tendency to produce a false confession does not render its truth less probable.": Henry's Pennsylvania Trial Evidence, 3rd Edition, p. 187. ". . . The object of evidence is to get at the truth, and a trick which has no tendency to produce a confession except one in accordance with the truth is always admissible.": *The Commonwealth of Pennsylvania v. Edward Cressinger,* 193 Pa. 326, 337, 44 A. 433. And see *Commonwealth v. Spardute,* 278 Pa. 37, 122 A. 161; *Commonwealth v. Walter E. Goodwin,* 186 Pa. 218, 40 A. 412; *Fife, Jones and Stewart v. The Commonwealth,* 29 Pa. 429. In appellant's brief it is stated: "Defendant was moreover unwittingly and unknowingly induced to endorse certain alleged oral and written statements as his own because of then existing apparent advantages to himself. At the time of his being taken into custody in South Carolina he was faced with the immediate decision of being imprisoned in the South which he obviously and intensely feared, or coming North to stand charges of parole violation in Chester County as represented to him. Both of the written statements to which defendant affixed his signature

show no crime higher than removing railroad spikes and tampering with railroads. The statements are silent as to a train wreck and murder. It was natural, therefore, for the defendant to grasp at the choice of the lesser of two evils, namely, a prison term in the North rather than serving in the chain gang in the South. . . .". The import of this statement evidently is that there was an inducement for defendant to make his oral and written confessions, and that they were not voluntarily made. In *Commonwealth v. Frank Wilson*, 186 Pa. 1, 40 A. 283, in discussing what constituted a voluntary or involuntary confession, this Court said: ". . . If it [a confession] is induced by what may be called collateral inducements . . . Such inducements are to be considered as affecting, not the admissibility of the statements made by the prisoner against himself, but their credibility. . . .".

The story of the defendant as to his whereabouts on May 9, 1948, which caused the officers together with the defendant to go to Middletown, Maryland on November 10th to ascertain its truth, was that defendant had spent part of the night of May 9th sleeping in a church at that place until he was discovered by the minister. This minister, Reverend Peaco, who was of the defendant's race, recalled the incident but said when interviewed on November 10th, and testified at the trial that it occurred in the fall of 1947. Reverend Peaco testified positively not only from his recollection but from a diary which he kept. The defendant did not deny at the trial that in the conversation between him and the minister which took place at Middletown during the interview on November 10, 1948, Reverend Peaco (who testified he, Peaco, had been informed by the officers that there had been "a bad wreck") told the defendant to tell the truth. Peaco testified he said to the defendant, " 'You tell the

truth. It will help you, because they are going to get the facts of when you were in our church, and if you tell the truth, it might help you' ". Obviously this admonition did not relate to defendant's parole violation. Reverend Peaco further testified that when the defendant found that he, Peaco, could not support defendant's statement that he had been in the church on May 9, 1948, he noticed "a very noticeable change in the defendant". Officer Smith who was present at this interview said the defendant "sort of slumped". Defendant's witness, Samuel Miller, a former employer of defendant in Delaware, testified on cross-examination that in July of 1948 he told the defendant " 'I have heard—I have read in the paper, rather, that they are looking for you, possibly that you are responsible for some wreck that happened.' "; and that two or three weeks later defendant "left suddenly" without notice.

The foregoing testimony alone evidences that defendant knew he was being interrogated for an offense far more serious than parole violation, and bears adversely upon his asserted reason or "inducement" for his confessions. At his second trial now under consideration, defendant ascribed his confessions to an "understanding and agreement" with one of the police officers. On cross-examination he testified: "Well, the conversation I had with him, it was understood with me that I was making a confession to attempting to move twelve of fifteen spikes, and that I would get some time up here and those charges in South Carolina would be forgotten.". He admitted he had not mentioned such "understanding and agreement" at his first trial. Nothing like this was said according to the officer's account of the conversation.

Whether an inducement was expressly made or impliedly created, and if it was, whether the inducement caused the defendant to make a false confession, were,

under all the testimony, clearly questions for the jury: *Commonwealth v. Spardute*, supra; *Commonwealth v. Bryant*, 367 Pa. 135, 79 A. 2d 193. At the request of defendant's counsel, the Court specifically charged: "Before considering the truthfulness of the defendant's oral and written statements, you must first determine whether such statements were freely and voluntarily made without any inducement or expectation of any promised benefit, or by the fear of any threatened injury. . . .". And again, "In considering whether the defendant's oral and written statements were voluntary, the Jury should give heed to any evidence which has been presented to them and which they believe may have induced the defendant to make such statement. If you entertain any reasonable doubt as to the voluntary character of the alleged oral and written statements of the defendant, it is your duty to resolve that doubt in favor of the defendant and to acquit him.".

(2), (3) Appellant claims that his prior convictions were not admissible into evidence, or if they were, they were not properly proven. As stated in our opinion in defendant's prior appeal, it has been established by many decisions in this Commonwealth that following the Act of May 14, 1925, P. L. 759, which imposed upon the jury the duty to determine whether the penalty for the crime of first degree murder should be death or life imprisonment, prior convictions are admissible as an aid in such determination. In the instant case the Commonwealth introduced into evidence docket entries of prior convictions attested by the court official in charge thereof and called the arresting officer in these prior offenses who identified the defendant as the person convicted thereof. The defendant did not question the authenticity of the docket entry records nor complain that he was not the same person charged with these prior offenses. On the con-

trary by cross-examination of the Commonwealth's witnesses he developed the facts surrounding his previous offenses of which he had pleaded guilty. Nevertheless it is claimed that the Commonwealth failed to properly prove the prior convictions which occurred in another state, by properly authenticated judicial records in accordance with the full faith and credit clause of the United States Constitution (Art. IV, Sec. 1) and the Act of Congress of May 26, 1790, as amended by the Act of March 27, 1804; U. S. Rev. Stat. §905. In disposing of this contention the lower court said: ". . . The law referred to by defendant's counsel, however, is the act which provides that if a certain procedure is followed certain record[s] must be given full faith and credit in another state. It does not mean, however, that they cannot be given such full faith and credit without following the Federal Act. . . .".

We deem it unnecessary to further discuss the legal question raised. Proof of prior convictions was admissible and could be considered solely for the purpose of having the jury fix the penalty at death or life imprisonment in case they first found the defendant guilty of murder in the first degree, and the jury was carefully instructed by the trial judge in this regard. Since the jury imposed the lesser of the two penalties, any error in the manner of proof of the prior convictions was harmless error.

(4) In his brief appellant states: "The learned trial judge was meticulous throughout this proceeding to insure a fair trial for the defendant, however, his statement that there was no obligation on the part of police officials to warn an individual of his constitutional rights when no legal proceeding is pending was prejudicial to this defendant. . . .". After stating the law generally in his charge with respect to the constitutional rights of a person accused of a crime, the trial

judge continued: "When you talk to a man, however, about the commission of a crime, and he is not charged, and at that time there is no legal proceeding pending, you don't have to warn him that he doesn't have to talk. Certainly you don't have to warn him of any Constitutional rights at that time. You may ask the man where he was on a certain day or things of that kind, and that may not be coercion.". In *Commonwealth v. Dilsworth,* 289 Pa. 498, 137 A. 683, this Court said at p. 505: ". . . No matter what other jurisdictions may have decided, there is no rule of law in Pennsylvania which says that declarations in the nature of confessions, . . . may not be tendered in evidence without first proving that the prisoner before making his declarations, had been formally cautioned and put on his guard, . . .". And in *Commonwealth v. Bryant,* 367 Pa. 135, supra, (certiorari by the United States Supreme Court denied), we said at p. 146: "The privilege against self-incrimination is a restraint upon judicial interrogation of one charged with crime. So long as statements by a suspect or an accused, made extrajudicially, are wholly voluntary, their admission in evidence against him later does not violate the constitutional privilege of remaining mute to relevant questions. . . .". And see this case for a review of the decisions on this subject generally.

In his argument appellant does not claim that the statement of the law by the trial judge was erroneous but that it was prejudicial in that the jury could only have construed it ". . . as a complete exoneration of the untruths, artifice, inducements and fraudulent misrepresentations of the police officials.". With this conclusion we cannot agree. Moreover it assumes the existence of the elements mentioned which would adversely affect or destroy the trustworthiness of the confessions. Their existence was for the jury. The court

repeatedly charged the jury that before considering the confessions they must find them voluntarily made. At the request of defendant's counsel, he specifically charged them: "If you believe as jurors that the oral and written statements of the defendant were obtained by oppressive, coercive, illegal and un-Constitutional methods, by reason of which they do not represent the wholly voluntary acts of the defendant, then said statements are incompetent and inadmissible and must be entirely disregarded by you without regard to the supposed truth of such statements.".

(5) Appellant's final contention is that the verdict of the jury was not predicated upon legally sufficient and competent evidence. The Commonwealth's case was based on the defendant's oral and written confessions, confirmation of material facts stated therein and his reenactment of the crime. The latter two elements furnished corroboration of his confessions. His first confession was oral and made to two of the police officers at Norristown on November 10th. The officers testified that the defendant inquired as to why he was wanted. One of the officers said, "Well, there has been some trouble on the railroad and they think you have been involved.". The defendant then said, "If you mean tearing up that track, I did that.". He then went on to place the occurrence as "up here a couple miles" and when asked where he had gotten the equipment, he said he had broken into a tool house. He also stated at this time to the other officer that the tools had been a bar and a track wrench and that an overcoat had been taken from the tool house, and gave the name of the place where he had torn up the tracks as Valley Forge. The officers testified that prior to this statement by the defendant his questioning from the time that the defendant was apprehended in South Carolina had been confined to his whereabouts on May 9, 1948, the date

of the crime. This was borne out by the testimony of the defendant. In his written confession made at the district attorney's office on November 11th, the defendant stated that he came to the scene of the crime from Harrisburg in a gondola car of a freight train, described as "two or three feet high, one like they haul steel and stuff like that.", which stopped in the vicinity of the tool shed. He said that there were two other colored men with him and that he and one of them took from the tool house a wrench, a crow-bar and a coat, after entering through a window.

As before stated, the Commonwealth did not believe the defendant's story of having confederates. Prior to the questioning by the district attorney at the time of his first written confession, the defendant gave the names of these alleged confederates as "Charlie" and "Ed". He later gave different names for them and after the preliminary hearing he said he did not remember their names nor recall the names he had earlier mentioned. In his first written confession he stated that he removed the spikes from the rail and that it was in the evening—about dusk; that afterward when he left the scene he went to Norristown partway on another freight train and then walked over a trestle. In reply to specific questioning he made it plain by his answers that material facts stated by him therein were not the result of any prior questioning or suggestion.

The Commonwealth adduced testimony that a freight train traveling eastward from Rutherford Station about five miles east of Harrisburg had stopped in the vicinity of the displaced track at 12:50 p.m., (Eastern Daylight Saving Time), and left at 2:15 p.m. This freight train had gondola cars loaded with steel as described by the defendant; also there was a freight train that defendant could have taken after the displacing of the rail and a trestle bridge across the

Schuylkill River that defendant could have used in making his way into Norristown. An overcoat which had been in the tool house was found after the derailment in a hole not far from the tool house.

On November 11th, the day after his first confession in writing, the defendant in company with the district attorney, three police officers and some newspapermen went to Port Kennedy Station and the defendant located the tool house and then pointed to the ladder which protruded from beneath the tool house and the window he had broken with a pick handle to gain entrance after mounting the ladder. The pick handle was found at the rear of the tool house. Before entering the latter he gave an accurate description of its interior and after entering pointed to where he had taken the bar and wrench and to the rail from which the coat had been taken. After leaving the tool house the party boarded a small gasoline flat car on the northernmost track and at defendant's direction proceeded westwardly until defendant said, "We are not too far from the place. Do you see that red steeple over there?", "It was right opposite that red steeple.". After they had gone a little farther, the defendant said, "We are getting pretty close to it. You better stop.". The defendant then pointed to the southernmost track as the one where he had displaced the rail. He also said he remembered a signal tower which was visible. One of the officers then walked along the track until he was stopped by defendant at the spot where the rail had been displaced. In his second written confession made on the same day after the reenactment, he gave more detail with respect to the happening and confirmed that he had located the place of the accident without any prompting or suggestion and was certain of it because he remembered the signal tower. The Commonwealth's witnesses testified that at no time

either prior to his first oral admission or during the time of the first confession, reenactment and second confession was he told of the place of the wreck, time of the wreck or anything pertaining to it. Neither was he told of the tool house, where it was located, how entrance was gained, what was taken from it, the track on which the derailment occurred and the visible landmarks such as a steeple and signal tower, nor of the trestle over which he walked to get over the Schuylkill River into Norristown.

Contrary to the testimony of the Commonwealth's witnesses, defendant testified at the second trial that he had read only a portion of his first written confession and none of the second, although he admitted signing his name on every page of both confessions and making corrections in one in his own handwriting. At the second trial defendant in his testimony claimed that the police officers furnished him with the information for the making of his oral and written confessions and his reenactment of the crime. The officers denied this. Upon cross-examination the district attorney developed that this testimony by the defendant was at marked variance with his explanation for the confessions given at the first trial. The defendant apparently was intelligent but there was much in his testimony that could have caused the jury to question his credibility and reject his attempt to explain away his confessions.

We do not deem it necessary to review in detail the defense of alibi. Defendant claimed that he was in Maryland on May 9, 1948, the date of the crime. He called as witnesses to substantiate the contention his mother, his brother, his sister-in-law and acquaintances from the South. The credibility of the defendant and these witnesses was for the jury. An alibi is an affirmative defense and the defendant had the burden of establishing it by the fair preponderance of the evidence.

The court correctly charged the jury: ". . . You will consider all that alibi testimony in connection with all the other testimony for such aid as it may be to you in determining the defendant's guilt or innocence. It may be that even though you are not satisfied of the alibi by the weight or the fair preponderence of the testimony, yet that testimony may be such as to raise alone or together with all the other testimony in the case that reasonable doubt which would cause you to find the defendant not guilty.".

It may be added that much of the testimony in support of the defendant's alibi was not convincing. One of the police officers called by the Commonwealth testified that on the evening that he made his first written confession the defendant told him that on the day after he displaced the rail he had gone from Norristown to Philadelphia and then hitch-hiked to Pocomoke City and that he then told various members of his family and friends that ". . . if anybody made inquiry for me that I was down there over that week-end,". The defendant denied this, but the jury could well have believed the officer.

In concluding this consideration of the defendant's fifth contention we are of the opinion that there was sufficient competent evidence to justify the verdict rendered by the jury, and this disposes as well of the reason asserted in support of defendant's motion in arrest of judgment that "the evidence is insufficient to sustain the charge and conviction.".

We have carefully reviewed the record in this case and find no reason for setting aside the verdict. Defendant received an eminently fair trial and enjoyed the benefit of representation by able counsel who were untiring in their efforts on his behalf.

Judgment and sentence affirmed.