## Commonwealth *v.* Graham, Appellant.

156

Argued March 13, 1962. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*Blair A. Griffith,* for appellant.

*Edward B. Doran,* Assistant District Attorney, with him *Richard E. McCormick,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, June 28, 1962:

William Russell Graham, fifty-four years of age, was indicted, tried and found guilty of first degree murder. In accordance with the jury's recommendation, the court imposed a sentence of life imprisonment. A motion for a new trial was denied. This appeal is from the judgment of conviction and sentence.

The defendant's only contention is that his conviction was secured and based solely upon oral, written and tape-recorded statements that he gave to the police; that these statements were obtained through duress and involuntarily made; that their admission into evidence at trial violated his rights under the Fifth Amendment and the due process clause of the Fourteenth Amendment of the United States Constitution, and the Pennsylvania Constitution.

The testimony of the Commonwealth may be fairly and briefly summarized thusly: Marcia Gail Cordon, fifteen years of age, on the evening of Monday, January 27, 1959, attended a high school basketball game in Irwin, Pennsylvania, with some of her school

158

friends. She had been driven to the game from her home, located in a small community approximately one mile from Irwin, in an automobile by her sister and the latter's boy friend. Following the game, about 9:30 p.m., she went to a close-by soda shop (Isalys), where the defendant was a frequent customer. She was looking for her sister in order to obtain a ride home; not finding her sister in the soda shop, she phoned to her home to ascertain if the sister had arrived there. She then left her school friends and started to walk towards Main Street in Irwin in the direction of her home. This was the last occasion anyone saw her alive.

On Saturday evening, January 31, 1959, her dead body was found, lying face down, in a small creek in a rural area about eight to ten miles from Irwin. A rape, if not perpetrated, had at least been attempted, she was severely beaten and the injuries to her body indicated that she had fought fiercely to keep her virginity from being violated. Her skirt had been removed and was found wedged underneath her body; her sweater was pulled up and was bunched underneath her chin; her brassiere was torn and was pulled down exposing her breasts.

A pathological examination disclosed, among other things: a comminuted fracture of the lower right leg involving both the tibia and the fibula; many severe bruises and contusions of the face, head, chest and arms; four large deep lacerations of the head penetrating through the scalp down to the bone, evidently made by the use of force with a hard foreign object; one of these contusions of the head measured on the inner side, one and one-quarter inches in width and one and three-fourths inches in length, was oblong in shape; a second degree laceration of the posterior portion of the vagina extending through the skin and mucuous membrane; smaller lacerations in the hymen itself. The

cause of death was a large subdural hemorrhage. The air passages and lungs were filled with air and devoid of water indicating death occurred before the body was immersed in the creek.

The body, when found, was lying about four or five feet from a culvert or bridge under which the water of the stream flowed. Near the top of the concrete wall of the bridge, bloodstains were evident; about four hundred and fifty feet away a pair of men's gloves were found lying off the roadway.

On Wednesday, May 20, 1959, the defendant was arrested and taken into custody for molesting and corrupting, during the summer of 1958, the morals of three young girls, who resided in the neighborhood.[1] A short time after being taken into custody, he admitted his guilt of molesting the young girls, and gave a signed written statement detailing the circumstances. At the time of his arrest, he was cautioned as to his constitutional rights as to the making of any prejudicial statements.

The above incriminating written statement was signed at the Pennsylvania State Police Barracks, Greensburg, Westmoreland County, about three o'clock p.m. The police continued to question him for about another hour and one-half since he was also under suspicion of having committed the Cordon killing. Then he was taken to the Greensburg City Jail where he was lodged for the night.

On the following morning, the defendant was returned to the state police barracks about 9:30 a.m., where he was questioned until about noon by two po-

---

[1] This evidence as to why the defendant was originally taken into custody and his admissions in connection therewith was not given to the jury during the main part of the trial. It was introduced after the defendant had been found guilty of murder in the first degree for the purpose of aiding the jury in determining the punishment to be imposed.

lice officers. At about 1:15 p.m., he was placed in a lineup and, in the course thereof, a woman employee of the state police pointed a finger in his direction and said, "That's the man." From about one-thirty until four o'clock p.m., he was again questioned by the police. Following this, he was taken to the Westmoreland County Jail for rest and confinement.

On Friday morning, May 22, he was interrogated by the police officers again, at the county jail, for about an hour. Shortly after one o'clock p.m., he was returned to the state police headquarters. *There, at his request, he was visited by an ordained missionary minister, one Mrs. Jennie Frazee.* The latter had become acquainted with the defendant about thirteen months before and saw him frequently thereafter at church meetings. She spent about four hours with him alone. *While they were alone,* he told Mrs. Frazee that he had killed the Cordon girl. She asked him if he wanted to confess to the police. When he indicated he did, she asked one of the state policemen to enter the room. The defendant immediately told the officer that he had killed Marcia Gail Cordon and he was glad to get it off his chest. Subsequently, an oral statement was given, then a written statement in question and answer form, and finally another oral detailed statement which was tape recorded. Later on, he was taken to the scene where the body was found and there reenacted in detail what had occurred on the unfortunate night of January 27, 1959.

In the narration of the events incident to the killing, he told of being in Isalys' store when the young people came in from the basketball game; how he drove his car down to Main Street in Irwin and picked up Marcia Cordon; that he drove her into a rural area and tried to molest her; that he stopped his automobile for a second time near a bridge; that the girl fought his advances; that he punched her and finally became

excited, grabbed a tire iron from the rear of the car and hit her many times over the head with it and finally threw her body over the bridge. He identified a tire iron found in his automobile as the lethal weapon. He also identified the pair of gloves found near the scene as his personal property.

The defendant did not take the stand in his own defense at trial. He, therefore, did not deny his guilt, nor did he deny the truthfulness of the statements given to the police. There was no evidence that he was mistreated or abused in any degree during his incarceration. *There were no long and protracted periods of constant and continuous questioning.* On the contrary, there were long and ample periods of rest. He was warned on more than one occasion of his constitutional rights. When he made the statements, he appeared cool, relaxed and relieved.

The defense complains that he was not fed substantial food and not fed regularly. The evidence belies this. They also complain that he was not showered and given fresh clothing during the two and one-half days of interrogation. A wash bowl was readily accessible during most of his confinement. The fact that he was not given hotel accommodations is readily understandable. It is asserted that the minister acted as a tool of the police to help wring and trick a confession of guilt out of the defendant. The circumstances do not warrant this conclusion. This was his friend and her presence was dictated by his own request. While they were alone, in the absence of the police, he admitted his guilt to her. There is no evidence of trickery or threats.

We have studied the record carefully and tried to view all of the circumstances objectively. We are convinced that the question of whether or not the prejudicial admissions were given freely and voluntarily was a question of fact for the jury under proper instruc-

tions from the court.[2]  We emphatically disapprove the act of the police in attempting to mislead the defendant during the "lineup" incident, but this in itself, under the circumstances presented, does not warrant the conclusion that legal duress or coercion existed.  While there were some discrepancies in the various statements as to the details of the occurrence, these were for the jury to consider, with all of the other circumstances, in evaluating the validity of the statements.  Also, the fact that the defendant did not admit and tell the police everything he did in connection with the attempt to ravish the victim does not affect the admissibility of the statements as given.

If a confession appears to have been voluntarily made, under circumstances likely to render it true, it must be admitted in evidence and the question of whether or not it is true and was freely given is for the jury to determine: *Commonwealth v. Spardute*, 278 Pa. 37, 122 A. 161 (1923).  A coerced confession is, of course, not admissible.  *Commonwealth ex rel. Sheeler v. Burke*, 367 Pa. 152, 79 A. 2d 654 (1951).  Due process requires the protection of an accused against any unfair advantage: *Commonwealth v. Bryant*, 367 Pa. 135, 79 A. 2d 193 (1951).  A confession which is the result of coercion is in law and in truth no confession at all.  However, for coercion to exist, there must be an impairing or overpowering of the will.  Expressed in another way, the will of the accused must be overborne at the time.  This may be accomplished in many ways and physical abuse need not be present.

By the same token, the law does not require the coddling of those accused of crime.  One such need not be protected against his own innate desire to unburden himself.  The fact that he is questioned by the police

---

[2] There is no complaint as to fairness, correctness or thoroughness of the charge in this or any respect. .

for a considerable period of time after being taken into custody does not, in itself, destroy the admissibility of any confession given: *Commonwealth v. Smith*, 374 Pa. 220, 97 A. 2d 25 (1953). See also, *Lisenba v. California*, 314 U. S. 219, 62 S. Ct. 280, 86 L. Ed. 166; *Lyons v. Oklahoma*, 322 U. S. 596, 64 S. Ct. 1208, 88 L. Ed. 1481; *Stein v. New York*, 346 U. S. 156, 73 S. Ct. 1077, 97 L. Ed. 1522; and, *Crooker v. California*, 357 U. S. 433, 78 S. Ct. 1287, 2 L. Ed. 2d 1448. Nor is a confession invalidated because a defendant was not at the time it was given represented by counsel in the absence of a request for such representation having been made: *Commonwealth v. Ballem*, 386 Pa. 20, 123 A. 2d 728 (1956). Even a trick which has no tendency to produce a false confession does not, in itself, affect the admissibility of a voluntary and truthful confession: *Commonwealth v. Johnson*, 372 Pa. 266, 93 A. 2d 691 (1953). Nor are confessions inadmissible merely because they are made in the hope of spiritual welfare and at the instance of a clergyman, who advises the accused that it would be better for him to tell the truth: *Commonwealth v. Snyder*, 224 Pa. 526, 73 A. 910 (1909).

The admissibility of confessions is to be judged on their evidentiary trustworthiness. The totality of the circumstances under which they are given must be considered.

Viewed in this respect, we are convinced that the undenied facts which this record presents shows no unfairness or coercion. The defendant's story was his own and its correctness is emphasized by several salient facts: the locale of the crime being near a bridge; the blood marks near the top of the concrete wall thereof; the wounds on the body consonant with the type of weapon defendant admittedly used; and, the telltale gloves found in the vicinity.

It is our considered conclusion that the voluntariness and trustworthiness of his confessions were for the jury.

Defendant finally complains that the information charging him with murder was not filed until May 25, and that he was not taken before a justice of the peace and arraigned until May 28. The mere delay in granting a defendant a preliminary hearing is not necessarily a denial of his constitutional rights, nor does such delay in granting a preliminary hearing make a confession obtained before the hearing inadmissible: *Commonwealth v. Agoston*, 364 Pa. 464, 72 A. 2d 575 (1950).

The confessions in this case were made on May 22. There is not a scintilla of evidence that the defendant was subjected to a single question after this date. It is reasonable to conclude that between May 22 and May 28, the investigating officers utilized every possible minute and means to check out the new developments in the case. *This period of time was not used in attempting to harass the defendant and in no way reacted to his prejudice.*

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

Here, the evidence as to the will-destroying or will-impairing influence upon the confessor is undenied, and is completely established. The inadmissibility of the confession presents a question of law for the court's summary disposition. See *Commonwealth v. Bryant*, 367 Pa. 135, 79 A. 2d 193 (1951).

From my analysis of the testimony, I am convinced that the statements of the appellant and the totality of the events that led to the making of the statements violated the due process clause of the Fourteenth Amendment.