# Commonwealth *v.* Hallowell, Appellant.

*Criminal law—Murder—Insanity—General insanity—Evidence.*

1. Mental unsoundness which exempts from legal responsibility for what otherwise would be felonious and therefore criminal homicide, denotes a mind so far devoid of understanding that it is unable to distinguish between right and wrong and is therefore without freedom of moral action. However unsound in mind a man may be generally it is only when he has lost utterly this power of moral perception that he ceases to be responsible in the eye of the law.

2. On the trial of an indictment for murder where general insanity is set up as a defense, and a large number of the witnesses, including two alienists, testify that in their opinion the defendant was of unsound mind, the court commits no error in charging as follows: "Before speaking of their (defendant's witnesses) testimony I would also say to you that the question here is not—Was this prisoner of unsound mind? Or, if you choose to put it so—Was he insane? That, gentlemen of the jury, is not the question. The question which you will have to determine is— was his mind so affected by disease as to make him irresponsible according to the standard set down by the law? And whether you approve of the law, whether the doctors approve of it, or any of us approve of it, we are bound to administer it as it is. In order to excuse the prisoner on the grounds of insanity it must be shown—and of course the burden of proof is upon him—by fairly preponderating evidence, that at the time when he committed the act his mind was so affected by disease, that he did not know the nature and consequence of his act. Or if he did know the nature and consequence of it, that he did not know that it was wrong and would be punished by law, or that he was so impelled by an impulse that he had no power whatever of resisting. That is the legal standard, gentlemen, and you will see that it is a very different standard from the mere general impression that a man is of unsound mind. If the prisoner knew the nature and quality of his act, if he knew that his act was wrong, and if he knew what he was doing at the time, he is responsible under the law."

Argued Jan. 4, 1909. Appeal, No. 318, Jan. T., 1908, by

defendant, from judgment of O. & T. Phila. Co., Nov. T., 1907, No. 1, on verdict of guilty of murder of the first degree in case of Commonwealth v. Walter Hallowell. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Indictment for murder. Before RALSTON, P. J.

The circumstances of the killing are stated in the opinion of the Supreme Court.

The trial judge charged in part as follows:

[We come now to the defense of the prisoner. I think I may say, before I start to speak of the testimony of the prisoner's witnesses, that they were an unusually respectable, honest, intelligent lot of people. Before speaking of their testimony I would also say to you that the question here is not, was this prisoner of unsound mind? or, if you choose to put it so, was he insane? That, gentlemen of the jury, is not the question.] [1] The question which you will have to determine is, was his mind so affected by disease as to make him irresponsible according to the standard set down by the law? and whether you approve of the law, whether the doctors approve of it, or any of us approve of it, we are bound to administer it as it is. In order to excuse the prisoner on the ground of insanity it must be shown —and of course the burden of proof is upon him—by fairly preponderating evidence, that at the time when he committed the act his mind was so affected by disease that he did not know the nature and consequence of his act. Or if he did know the nature and consequence of it, that he did not know that it was wrong and would be punished by law, or that he was so impelled by an insane impulse that he had no power whatever of resisting. That is the legal standard, gentlemen, and you will see that it is a very different standard from the mere general impression that a man is of unsound mind. If the prisoner knew the nature and quality of his act, if he knew that his act was wrong and if he knew what he was doing at the time, he is responsible under the law. Unless his mind was so affected by disease that he could not control his actions, or his knowledge of what he was doing was destroyed, he is

responsible. That is the legal standard and the test, and you must apply it.

Coming to the testimony on behalf of the prisoner, a great many witnesses were called to exhibit to you so far as possible the prisoner's whole life. [It was shown in the first place that some of his forbears had been insane. His father testified that he had a sister who suffered from brain disease; that his grandmother's brother had been in a room for years; that he had an uncle who died of softening of the brain; that his father's first cousin was insane, and that his grandfather had paralysis, which attacked his brain and he committed suicide. It was shown by the prisoner's parents that he was a delicate, nervous child. Of course, you will consider that for what it is worth.] [2] It appeared in other parts of the testimony that the boy went to school with other boys, and his companions come here now and say that he was much the same as other schoolboys. Indeed, I got the impression—and of course, gentlemen, my impressions are not to govern or sway you at all, the testimony being for your consideration—that the defense came down to the fact that the man's mind began to alter and change some five or six years ago. A great number of these witnesses were called to testify to peculiar actions; I could hardly name them all, nor refer to each one of them. I will mention a few, however.

[Dr. Purvis, the dentist, testified to the prisoner having been injured in the head while playing baseball and having been knocked insensible. That apparently did not have much effect upon him, for he was up and about and playing baseball again in a very short time, and that was years ago.] [3] A witness testified that his conversation was erratic, that he had a peculiar expression and sometimes a vacant stare; another that he ran or drove a horse deliberately into a heavy wagon loaded with stone. The doctor said that he came over to his office and flourished a revolver there and said, "The dirty suckers are after me;" that he had a pair of shoes on which were not mates and conversed in an irrational manner. It was testified that he threw a paper in a car and afterwards went up and asked a man why he had stolen his paper; that on one occasion

when a man treated him to a drink and some lunch he threw it on the ground; another time he left his change on the counter; another time he greased the harness with a lotion instead of oil; another time he drove a hay wagon into the creek and sat there apparently oblivious of any danger that might be present; at another time he wanted to buy fish from a rag man; that he jumped from one subject to another; that he apparently got lost while driving a feed wagon; that at his brother's wedding he behaved in a very peculiar manner and at his brother's funeral he behaved in a most unfeeling, irreverent way, asking at the grave if certain men who were pallbearers would come back to the house and play cards with him; also, that he was very erratic in the way of planting corn and harrowing a field, harrowing it across instead of lengthwise. Others said that he was rambling in his talk; that he told a barber that he did not know how to comb his hair; that he thought people were doing things against him at times and that he had a silly grin and foolish expression. It was testified that at another time he grabbed one of his friends in the car and began to tussle with him; that he complained that the room in which he was was too warm when it was really cold, and took his coat off, and then put his coat on and said it was cold, when the temperature was just the same as it had been. Another man testified that he had used profane and abusive language in the station and on one occasion grabbed a flower that was in a man's buttonhole and pulled it out. Another man testified that he pushed him over a stove, and another that he made uncomplimentary remarks to him across a hedge. I shall not attempt to refer to all the peculiar incidents testified to by this great number of witnesses. [I consider it unnecessary for me to read their testimony to you or to review it with any minuteness or detail. You heard all the testimony, and if you do not remember every detail of it you at least have the general effect of it in your minds. Many or probably all of the witnesses who testified to these peculiar acts said that in their judgment the man was of unsound mind.] [4]

That was followed by expert testimony. Expert testimony, gentlemen, is opinion testimony given by men who have made

a special study of the subject for many years. In this case the experts for the defense are not only gentlemen of the highest reputation for integrity, not only honorable, fair-minded men, but they stand very high in their profession. They are very eminent men and men who are respected by all who know them. I refer to Dr. Mills and Dr. Dercum.

[Dr. Mills told you that he considered the prisoner insane; he stated to you the basis of his opinion, which was founded not only upon the evidence which he had heard from the lay witnesses, but also upon personal examinations of the prisoner which he had made. Dr. Mills was asked a question which brought to his attention and to yours the legal test of responsibility—not whether the man is insane, but whether he knew the nature and quality of his act—whether he knew what he was doing and could have refrained from doing it if he had so willed. Dr. Mills testified as follows: "Q. In reference to the act itself, do you believe he understood what he was doing at that time? A. I do not believe he understood it as a sane man would. The testimony is very meager as to the act itself, at least what I heard. I do not believe that he understood it in what might be termed a sane way."

So you see, gentlemen, he does not express the opinion positively that the prisoner did not at that time understand what he was doing, but he says he does not believe he understood it as a sane man would.

Dr. Dercum testified that in his opinion and for reasons which he gave to you the prisoner was insane. He was asked practically the same question as Dr. Mills, which is the question you have to determine as the test of the prisoner's legal responsibility. He testified as follows: "Q. Do you think he understood and comprehended what he was doing when he shot this girl? A. I believe that he may have. No one can know just what the state of his mind was at that time. It is, of course, only a matter of conjecture as to the condition of his mind. He may have known if the pistol was a weapon and he could discharge it at the person that it would kill."

As illustrating the difference between the legal standard of mental responsibility and the view taken by doctors as to

whether a man is insane or not I will read this question and answer from the testimony of Dr. Dercum: "Q. Then, as I understand you, you say that you don't believe that that man on that day when he took this girl's life did not know what he was doing, did not plan it, and did not know what he set out to do? A. He may have done all that and still have been insane."

That is "insane" from a medical point of view, but does that come within the legal standard which I have given to you? Reading further from his testimony on that page: "Q. The question is whether he knew what he was doing. A. I say that no one could know the state of his mind—that would be matter of conjecture. Q. Is it your opinion that he knew the difference between right and wrong, wrong in the sense of being that for which he would be punished? A. I do not believe the idea of punishment ever occurred to him at all, until perhaps after the whole thing was over. Q. It occurred to him immediately afterwards. A. Possibly according to the evidence which is that he said 'I am done for.' "] [5]

[Now, gentlemen, does that testimony of these two expert physicians in conjunction with the testimony of the lay witnesses, establish that the prisoner when he shot this girl did not know what he was doing, and did not know right from wrong? In other words, does it establish such a state of insanity as the law recognizes as an excuse for crime?] [6]

Verdict of guilty of murder in the first degree. Defendant appealed.

*Errors assigned* were (1-6) above instructions, quoting them.

*Maxwell Stevenson,* with him *Walter P. Bishop* and *Harry S. Ambler, Jr.,* for appellant.—The charge was inadequate on the subject of insanity: Meyers v. Com., 83 Pa. 131; Com. v. Moore, 2 Pitts. 502; Pannell v. Com., 86 Pa. 260; State v. Rippy, 10 S. E. Repr. 259; Goersen v. Com., 99 Pa. 388; Hodder v. Rapid Transit Co., 217 Pa. 110; Com. v. Elvin, 5 Pa. Dist. Rep. 593.

*Joseph H. Taulane,* assistant district attorney, with him *Samuel P. Rotan,* district attorney, for appellee.—It is sub-

mitted that the statement of the law in the charge is in harmony with all the decisions of the court: Com. v. Mosler, 4 Pa. 264; Sayres v. Com., 88 Pa. 291; Taylor v. Com., 109 Pa. 262; Com. v. Wireback, 190 Pa. 138; Com. v. Lewis, 222 Pa. 302; Com. v. Moore, 2 Pittsburg, 502.

OPINION BY MR. JUSTICE STEWART, March 1, 1909:

After a trial in which defendant had accorded to him every privilege which an accused has a right to demand or expect, the appellant was convicted of murder in the first degree. The record is practically free from exceptions, and none are here brought for review except a general one to the charge of the court. The several assignments of error show to what severe analysis and scrutiny this charge, evidently intended to be full, fair and impartial, has been subjected to at the hands of able and zealous counsel. Separate discussion of each is unnecessary. In the argument on appellant's behalf several propositions have been submitted which include them all, and in disposing of these every assignment will have been considered.

The fact of killing was not denied; nor was there any dispute as to the circumstances attending the immediate commission of the act. The victim was a young woman about thirty years of age. She was shot and killed by the prisoner on the evening of October 14, 1907, at about six o'clock, on a public street in the city of Philadelphia, while returning home from the place of her employment, in company with two of her female friends. The prisoner a half hour before had gone to the shop where she worked, and inquired whether she was still there. In company with two companions of his own, he overtook these girls while on their way, and advancing upon his victim discharged a pistol at her head, with no other effect, however, than to throw her from her feet upon the ground. Instantly he was over her, and while she was there prostrate, fired the shot which quickly terminated her life. To the officer who made the arrest, and within a few minutes after the occurrence, he said he shot the girl because he wanted some money from her with which to pay a doctor; that he had been going with her for a long time but that she had refused to go with him any more; that he was suffering

from a painful disorder, and that his friends were ridiculing him on account of the girl denying him her company. The evidence discloses nothing else as to the motive which prompted the act. The only defense set up was general insanity. It was not pretended that the appellant in taking the life of his victim was under the control or influence of illusion or hallucination. What is known as partial insanity was therefore not in the case. The whole defense rested on general unsoundness of mind. Whether this condition can be urged as a sufficient defense against an accusation of crime, depends upon the extent and degree of the unsoundness. Any variation, however slight, from normal conditions, implies unsoundness in some degree; and ordinarily when one is said to be unsound mentally, the expression indicates nothing as to the extent or degree of the variation. There is, however, nothing uncertain or indeterminate in these words when they are used to denote the mental unsoundness which exempts from legal responsibility for what otherwise would be felonious and therefore criminal homicide. The words used in this connection have a fixed and definite meaning; they denote a mind, so far devoid of understanding that it is unable to distinguish between right and wrong, and is therefore without freedom of moral action. However unsound in mind a man may be generally, it is only when he has lost utterly his power of moral perception that he ceases to be responsible in the eye of the law. Therefore it is that whenever insanity is set up as a defense to an accusation of crime, it becomes the duty of the trial judge to clearly define to the jury what kind or degree of insanity absolves, to the end that they may intelligently understand the real point at issue, and weigh with discriminating judgment the evidence submitted to them. And this is what the learned trial judge did in this case in very full and careful instructions. When about to review the testimony of the defendant's witnesses, he found occasion to remind the jury of the distinction he had directed them to observe in determining the question of the defendant's legal responsibility, and what was said in this connection is made the subject of earnest complaint. Very many witnesses, testifying in defendant's behalf—some forty in all—impressive not only in numbers,

but in intelligence and character as well, testified to defendant's general unsoundness of mind, each giving some peculiarities of conduct which led to the conclusion expressed. Among these were several alienists, who testified to like effect, but resting their conclusions largely, however, upon personal examination of the defendant subsequent to his arrest. Excepting these latter, the witnesses were neighbors and acquaintances who had had opportunity, much or little as the case might be, to observe the conduct and behavior of defendant for varying periods. Each and all expressed the opinion that defendant was of unsound mind; but it was the fewest number, not more than three or four as we count them, who attempted to define or indicate the degree of unsoundness. In the exception referred to, the witnesses having expressed the opinion from what they had observed that defendant was insane, were asked, by one side or the other, whether they regarded him as so far deprived of reason and understanding that he could not have comprehended the moral character of the act of which he was accused. Apart from these, however, so far as the lay witnesses were concerned, the defendant's case rested on their general concurrence that defendant was simply of unsound mind, and the facts given in support of this conclusion. The reference made by the trial judge to the testimony, and which is complained of, was as follows: "Before speaking of their testimony (defendant's witnesses), I would also say to you that the question here is not —Was this prisoner of unsound mind? or, if you choose to put it so—Was he insane? That, gentlemen of the jury, is not the question." Later on in the charge this occurs, and in the assignment it is coupled and associated with the expression above quoted,—"The question is not whether he is eccentric or peculiar, or what these people call unsound, but the test is as I have stated to you and as so stated you must apply it to this case." These extracts are from very widely separated parts of the charge, and the incompleteness of each is apparent; yet each standing by itself can easily be vindicated. It is a test, however, to which no charge should in fairness be subjected. As we have already said, general unsoundness of mind, unaccompanied with loss of power to distinguish the moral element in an act,

is no defense in law where crime is charged. Evidence of general unsoundness is admissible of course, for it is only when the whole mental condition of the accused is exhibited that the extent or degree of the insanity can be determined. The test comes not upon offers of evidence, but when the jury is in possession of the whole case, and the real issue is to be determined by them. All the evidence is for their consideration, but its importance is to be judged by the light it reflects upon the one question of the accused's legal responsibility for his actions. Therefore, when the judge said to the jury that the question they were deciding was not whether the prisoner was of unsound mind or insane, he was strictly within the law. What they were to determine was a question of legal accountability; and since this could exist even where there was unsoundness, the statement of the court was not only entirely correct, but, in view of the character of the testimony he was about to review, it was none too direct or positive; for however correct defendant's witnesses were in the opinions expressed that defendant was a man of unsound mind, it is manifest from the facts given by each in support of such inference, with the few exceptions, that the unsoundness they were considering was not that which in law exculpates. The instruction did not suggest to the jury that they might disregard the facts testified to by these witnesses, nor indeed the opinions expressed by them; but it did point them to the one standard required by law, to the disregard of any different standard that may have been in the minds of the witnesses. It is complained that it minimized the value of the testimony of defendant's witnesses; indeed, that it practically nullified it, especially when considered along with this latter expression: "The question is not whether defendant is eccentric or peculiar, or what these people call insane." Conceding that such was the effect, the fault lay not with the instruction, but with the evidence. The complaint, however, greatly exaggerates the effect. The instruction, as the jury must have understood it, required a consideration of all the evidence. It did unquestionably impair the force of opinions and conclusions where the witnesses spoke of a general unsoundness of mind; but it left every fact on which these opinions

were based, for the consideration of the jury in connection with the one issue they were trying. If the instructions complained of be allowed their true setting, their absolute fairness and correctness will be all the more apparent. The remark that the question was not whether the defendant was of unsound mind, or insane, was, as we have said, preliminary to a review of the defense; and it was immediately followed, beginning with the very next sentence, by this very clear direction: "The question which you will have to determine is—Was his mind so affected by disease as to make him irresponsible according to the standard set down by the law? . . . . In order to excuse the prisoner on the ground of insanity it must be shown—and of course the burden of proof is upon him—by fairly preponderating evidence, that at the time when he committed the act his mind was so affected by disease that he did not know the nature and consequence of his act. Or if he did know the nature and consequence of it, that he did not know that it was wrong and would be punished by law, or that he was so impelled by an insane impulse that he had no power whatever of resisting. That is the legal standard, gentlemen, and you will see that it is a very different standard from the mere general impression that a man is of unsound mind. If the prisoner knew the nature and quality of his act, if he knew that his act was wrong and if he knew what he was doing at the time, he is responsible under the law." The other remark complained of—"What these people (defendant's witnesses) call unsound"—occurs in this instruction: "It is incumbent upon the defense I say to satisfy you that the prisoner did not know the nature and quality of his act, that he did not know that his act was wrong in the sense that it would be punished by law, or that he had not the will to resist, that his mind from disease was so clouded and weakened that he was unable to control his actions, and did not know what he was doing or had no power to resist the impulse to do it. That, gentlemen, as I have said to you several times, is the test of a man's responsibility in the law. The question is not whether he is eccentric or peculiar or what these people call unsound, but the test is as I have stated to you and as so stated you must apply it to this case."

These instructions were not only correct, but the peculiar facts of this case required that they should be no less explicit and direct than the learned judge made them. Two alienists, of highest distinction in their profession, were called by the defense. Both expressed the opinion, founded upon examination made after defendant's arrest, that he was of unsound mind. Here again, in reviewing this testimony, the trial judge directed the jury to apply the same test. "Does the testimony of these two physicians (after quoting parts), in conjunction with the testimony of the lay witnesses, establish that the prisoner when he shot this girl did not know what he was doing, and did not know right from wrong? In other words, does it establish such a state of insanity as the law recognizes as an excuse for crime? It is here urged that the defense was prejudiced by the reference made by the court in this connection to the specific question addressed to each of these witnesses, as to whether defendant understood and comprehended what he was doing when he shot his victim, and the answers made thereto, inasmuch as the question was thus limited to a comprehension of the physical act itself, and had no regard to perception of moral quality. The contention was that this was a misleading interpretation of the testimony, and imposed on the defense the burden of showing a greater degree of mental unsoundness than the law required, since one may so far comprehend his act as to know that a pistol shot may kill, and yet be so insane as not to be legally accountable for firing it. But this, to say the least, is hypercritical. By iteration and reiteration the learned judge had in express terms instructed the jury what was meant by comprehension of the nature and quality of the act, and that the prisoner was only responsible under the law in case they found "that he knew the nature and quality of his act; knew that the act was wrong, and knew what he was doing at the time." The jury must have understood that all these elements were included in the question addressed to the witnesses. The witnesses themselves certainly so understood the question, and their answers were sufficient, if there were nothing else, to avoid misapprehension by the jury.

There is quite as little merit in the exception taken to the

judge's failure to instruct on the question here sought to be raised on defendant's intoxication. We agree, that had there been any evidence that at the time of the shooting the defendant was intoxicated from drink, it would have been the duty of the court, even without being so requested, to direct the jury's attention to this matter in passing upon the degree of defendant's guilt, if found to be legally responsible for his act; but there was no such evidence. So too with respect to the complaint that in several instances in speaking of the burden resting upon the defendant, in connection with the defense of insanity, the court said the burden was upon him to establish the fact. In an earlier part of the charge the jury had been distinctly told that all that was required of the defendant in this regard was to establish such fact by a preponderance of evidence. This instruction was entirely adequate to an understanding by the jury of the measure of proof to be observed.

The remaining assignments simply question the general fairness and impartiality of the charge. We have given them all careful consideration. In the presentation of the evidence on the one side and the other, the charge, as we read it, is characterized by the utmost fairness. Specific reference to each item of testimony is never required; here it was impracticable in view of the fact that the evidence for the defense alone covers nearly 200 pages of the record. Doubtless some of this, which defendant's counsel thinks important, escaped special reference; but this is something not always to be avoided, and in this case it suggests neither unfairness in purpose or effect. It is certainly true that the charge was full and comprehensive to a degree which must have served to recall to the minds of the jury the evidence pertinent to the main questions in the case. A review of the whole case discloses no error, and leaves us in no doubt whatever that the defendant had a fair and impartial trial, with every right accorded him. That he is a proper object of pity because of his enfeebled mental power, however caused, whether by development of hereditary taint or his own evil courses, or both combined, must be admitted; but that he fully understood the nature of the act he was committing in taking the life of his victim; and that he was conscious of the

moral and legal guilt he was incurring, and the dread penalty he faced, was the finding of the jury under careful and correct instructions, and after patient and intelligent deliberation. We see nothing in the case that would justify us in disturbing that finding.

Judgment affirmed, and record remitted for the purpose of execution according to law.