Commonwealth *v.* Smith, Appellant.

Argued March 23, 1953. Before STERN, C. J., STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ. Appeal, No. 25,

*William J. McKnight, 3rd* and *Jesse P. Long,* for appellant.

*William A. Sykes,* District Attorney, with him *George H. Kurtz* and *John E. Aikman,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY, May 28, 1953:

The defendant, Donald Leroy Smith, was tried on an indictment which charged him with the murder of one Otto McConnell. After a trial which lasted ten days, the jury found the defendant guilty of murder in the first degree and fixed the penalty at life imprisonment. Defendant's motion for a new trial was dismissed and this appeal is from the judgment and sentence entered in accordance with the verdict.

The deceased, a bachelor who lived alone on his farm, was last seen alive by other than defendant at 4:30 P.M. on April 9, 1951. His body was found on the floor of his barn by his sister on April 11, 1951 at 11:30 A.M. X-rays and autopsy revealed four .22 calibre bullets in his head and one in his neck. Death had resulted from bullets entering his brain. Investigation by the State Police revealed that the deceased's 1949 Chevrolet truck was missing. Suspicion was directed toward defendant, a 16 year old youth, who was missing from the home of Frank Shofestall (located eight miles from McConnell's farm) where he had been placed on parole as a juvenile delinquent. At about the time defendant departed from the Shofestall home, a gray jacket, four silver dollars, a $5 bill and a .22 calibre revolver also disappeared. Testimony was introduced by the Commonwealth to show that on March 31, 1951, defendant said to Max Shofestall, son of Frank Shofestall, that "I'll get him yet", referring to McConnell, and stated that the deceased had accused defendant of stealing and cheated him out of some money; that on April 8, 1951, at 8:00 P.M., defendant took a taxicab from a point some distance from the Shofestall farm to a point two and one-half miles from McConnell's farm; that at about 8:00 P.M. on April 9, 1951, about three and one-half hours after deceased was last seen alive, defendant was seen driving a Chevrolet truck in Emrickville, Pennsylvania (about eight miles from the McConnell farm),

and at 11:00 P.M. on the same date he was seen driving the same truck near Freeport, Pennsylvania (about 60 miles southwest from the farm of the deceased). The truck, which had been missing from McConnell's farm, was found on April 10, 1951 where it had been abandoned near New Martinsville, West Virginia. Defendant hitch-hiked as far south as Dallas, Texas and New Orleans, Louisiana, and eventually appeared on June 4, 1951 at the Travelers' Aid Office in a railway station at Hattiesburg, Mississippi. He identified himself to Mrs. Rannie Berdette, a case worker for the Travelers' Aid Society, told her he was hungry, that he had run away and wanted to go home. Defendant told Mrs. Berdette that his parents had no telephone, but that Dr. Shaffer, on whose farm they lived, did. After giving defendant a meal ticket, Mrs. Berdette called Dr. Shaffer on the telephone and was informed that defendant was wanted on a very serious charge. She then called the Hattiesburg police, but before they arrived defendant returned and had a further conversation with Mrs. Berdette. In this further conversation Mrs. Berdette asked defendant what he had done and he said: "I shot a man and killed him." and "I shot him five times.". Shortly thereafter defendant was taken into custody by the Hattiesburg police. About one hour later he was questioned by four Hattiesburg police officers, who knew nothing about him except that he was wanted in Pennsylvania. After being questioned for one-half hour, defendant made a statement which was typed by one of the officers and signed by defendant. The whole procedure, including the questioning and typing of the statement, consumed about one hour. This statement consisted of about 300 words in narrative form and was a confession that defendant had killed Otto McConnell.

On June 6, 1951, Officer John Lepley of the Pennsylvania State Police and Sheriff Joe Shaffer of Jefferson County, Pennsylvania, arrived in Hattiesburg, Missis-

sippi to return defendant to Jefferson County, where he had been charged with McConnell's murder. On the next day, June 7th, Smith was again questioned for an hour in the presence of Officer Lepley and Sheriff Shaffer and three of the officers of the Hattiesburg police force. Defendant made another statement which was reduced to writing and signed by him, in which he repeated the facts set forth in his original signed confession and admitted that he killed McConnell.

On the same day, June 7, 1951, Sheriff Shaffer and Officer Lepley left Hattiesburg with defendant in an automobile, and arrived with him at the Clarion, Pennsylvania, State Police Substation at midnight on June 9th. There, in response to questions by the district attorney and assistant district attorney of Jefferson County and a State Police officer, defendant again confessed that he had killed McConnell. The period of interrogation was 50 minutes. Although this confession was in question and answer form and contained more detail than the prior confessions, it was in most respects a repetition of the facts contained in them. It was reduced to writing by the district attorney's secretary and signed by defendant.

Defendant was arraigned before a justice of the peace in Brookville, Jefferson County, Pennsylvania, at 6:00 A.M. on June 10, 1951 and lodged in the Brookville jail to await trial. While he was there defendant made two more oral confessions, one on June 14, 1951 to Guy Wetzel, who brought the food to the prisoners, and another on October 17, 1951 to Henry Davis, a Brookville police officer. All of the six confessions were admitted into evidence.

Defendant did not testify at the trial, which commenced on November 5, 1951, and the only defense offered was insanity. Members of his family, neighbors and school teachers testified to his early background and his conduct and habits generally. It was testified that

defendant had an intelligence quotient of 111, which is above average; that he was one of 13 children; that his family had been supported by public assistance and by tenant farming the farm of Dr. R. L. Shaffer for eight years. The principal witness for the defense was Dr. M. H. Bowers, a psychiatrist, who had examined defendant on October 23, 1951, and on the basis of that examination and a hypothetical question testified that defendant was mentally ill and did not know the difference between right and wrong on April 9, 1951, the date of the crime.

In rebuttal the Commonwealth called as a witness Dr. Robert H. Israel, Superintendent of Warren State Hospital, a psychiatrist, who testified that he had examined defendant on August 18, 1951 and had heard all of the testimony in the case and that in his opinion defendant at the time of the trial and on April 9, 1951 was aware of the nature and consequence of his acts, knew the difference between right and wrong and was not insane or mentally ill.

After an exhaustive charge by the court, which covered 79 typewritten pages in the original transcript of testimony, the jury, after deliberation, returned a verdict of guilty and fixed the penalty at life imprisonment. Appellant contends that his motion for a new trial should have been granted and alleges nine trial errors. We will consider them in the order presented.

His first contention is that the court erred in its charge on the subject of insanity. It first should be noted that only a general exception was taken to the charge and therefore the court can be reversed only for fundamental error therein. The court's charge on this subject was extensive, covering approximately six pages of the transcript of testimony. Appellant relies upon a statement made by the trial judge when he was contrasting the testimony of the defendant's expert witness with that of the Commonwealth's expert called in rebuttal.

Prior to the discussion of this testimony the court had charged: "Such defenses as insanity, or a mind not conscious of its acts, are affirmative defenses and the burden is on the defendant to establish them by fairly preponderating evidence, showing an unsound mind at the time the act was done. Insanity, or a mind not conscious of its acts, constitutes a complete defense to the crime charged. To excuse the defendant on the ground of insanity, it must be shown by the defendant by fairly preponderating evidence that at the time when he committed the act his mind was so affected that he did not know the nature or consequences of his act; or if he did know the nature and consequence of it, that he did not know that it was wrong and would be punished by law . . . . If the defendant, although, as he alleges, he labored under insanity at the time of the shooting, understood the nature of his act, then and there had knowledge that it was wrong, and mental power sufficient to apply that knowledge to his own case and knew if he did act he would do wrong and receive punishment . . . he would be responsible . . . The plea of insanity at the time of committing the crime is a well recognized defense. The defendant has made out a defense that calls for acquittal if the jury finds from the fair preponderance of the evidence that at the time of the killing he was so mentally deficient that he did not know what he was doing, or that he did not realize the nature or appreciate the consequences of the act he was committing. . . If the defendant has satisfied you by fairly preponderating evidence that he was insane at the time Otto R. McConnell was killed, although the Commonwealth has convinced you that defendant did the shooting, you would find him not guilty. As to the law regarding the defense of insanity, I shall state it to you again: Was the defendant's mind so affected by disease as to make him irresponsible according to the standard set down by the law? In order to excuse the defendant

on the ground of insanity it must be shown—and of course the burden of proof is upon the defendant—by fairly preponderating evidence, that at the time when he committed the act his mind was so affected by disease that he did not know the nature and consequence of his act. Or if he did know the nature and consequence of it, that he did not know that it was wrong and would be punished by law. . . . If the defendant knew the nature and quality of his act, if he knew that his act was wrong and if he knew what he was doing at the time, he is responsible under the law.".

The court, turning to the testimony, then charged: "The test you must apply in this case is whether or not defendant knew the nature and quality of his act; knew that the act was wrong, and knew what he was doing at the time. Does the testimony of Dr. Bowers, who examined the defendant, in conjunction with the testimony of the lay witnesses, establish that the defendant when he shot Otto R. McConnell, if you believe he did shoot him, did not know what he was doing, and did not know right from wrong. In other words, does it establish such a state of insanity as the law recognizes as an excuse for crime? Again, Members of the Jury, does the testimony of Dr. Israel, who also examined the defendant, in conjunction with the testimony of the lay witnesses, establish that the defendant when he shot Otto R. McConnell, if you believe he did shoot him, did know what he was doing, and did know right from wrong? Here, Members of the Jury, you have the testimony of two experts, whose testimony is diametrically opposite. Whose testimony are you going to believe? That, Members of the Jury, is a question for your determination.".

Appellant complains of the portion of the charge last above quoted in that as applied to the testimony adduced on his behalf, it set forth a test for legal responsibility, not legal insanity, because the court used the word

"and" rather than "or". His contention is that the burden was thus placed on him to show that he did not know the nature and quality of his act *and* that the act was wrong *and* also that he did not know what he was doing at the time in order to be entitled to an acquittal for insanity. Most modern definitions of legal insanity are based on *M'Naghten's Case,* 10 Cl. & F. 200, 8 Eng. Rep. 718, where the rule is stated in the disjunctive. This is the rule in Pennsylvania, where the most recent definition is set forth in *Commonwealth v. Heller,* 369 Pa. 457, 87 A. 2d 287. Ascribing the import of the language complained of to be as appellant contends, then, standing alone and taken literally, the use of the conjunctive instead of the disjunctive was incorrect. But the court at this point in the charge was not defining insanity but simply pointing out to the jury that they had to decide which of the two expert witnesses they would believe. The instructions in this regard followed and were predicated upon the court's elaborate treatment of the subject. The language complained of must be considered in the context in which it was delivered. After having previously iterated and reiterated the defense of insanity, thoroughly and correctly defining it and legal responsibility, it cannot be said that there was prejudicial error in the way that the court presented the conflicting testimony of the psychiatrists to the jury. If counsel felt that the portion of the charge of which they complained had any tendency to mislead the jury, they should have called the alleged error to the attention of the trial judge when at the conclusion of the charge, he inquired, "Do counsel for the defendant or counsel for the Commonwealth desire the court to further instruct the jury or correct any instructions heretofore given?". Although defense counsel then made several requests with respect to the charge, they made none with reference to the portion of the charge of which they now complain. It was only after the charge was

transcribed and zealous counsel for appellant had an opportunity to minutely examine it that this hyper-critical contention was made. It cannot be held that there was reversible error when the entire charge on the subject of insanity is considered. Cf. *Commonwealth v. Hallowell*, 223 Pa. 494, 72 A. 845.

Appellant's second contention is that the court made remarks which the jury may have construed as exhibiting antagonism toward defense counsel and unduly limited cross-examination by the defense. Under this contention appellant first argues that the court erred in refusing to withdraw a juror after making the remark: "You have been asking for it." to defense counsel. This occurred while defense counsel was cross-examining Officer Vinson of the Hattiesburg police, who was present when defendant made his first written confession. Counsel had asked a series of questions concerning the attitude or actions of defendant at the time he made the confessions. The record then discloses the following: "Q. Did he appear scared—frightened to you? A. No, sir. Q. Did he appear nervous to you? A. No, sir. Q. Just calm and cool? A. He was and I didn't see any cause for him to be scared. MR. LONG: I ask that that be stricken from the record, the voluntary statement, and the Jury instructed to disregard it. It is a conclusion. BY THE COURT: You have been asking for it. Go ahead. (Side bar discussion). MR. LONG: The defendant contends that the comment of the Court was improper and prejudicial to the defendant and, therefore, moves for the withdrawal of a juror and the continuance of the case. BY THE COURT: The statement of the Court is that you have been asking for them, meaning that the questions of defense counsel were of such a nature that the witness could only give conclusions. The motion is overruled.". It should be noted that no exception was taken to this ruling of the court. In his questions defense counsel was clearly asking for

conclusions by the witnesses and the comment by the court was simply a statement to that effect with particular reference to the response made by the witness to counsel's question "Just calm and cool?". It is quite clear that no animosity to Mr. Long was displayed by the court and none could be inferred by the jury.

Appellant's counsel further argues that he was openly reproached by the court in two other instances which occurred as follows: "Q. Now, Mr. Vinson, this man Herring is a two fisted kind of an officer, isn't he? This man Herring is a two fisted kind of officer, isn't he? MR. SYKES: Objected to. Does Mr. Long mean does he have two hands, what kind of hands does he have? MR. LONG: The officer knows what I mean. BY THE COURT: Mr. Long, reframe your question to use language which should be used in the Court. . . Q. And how long were you there before the District Attorney and his crew arrived? MR. SYKES: We object to the word 'crew'. It [is] unfair and uncalled for. BY THE COURT: Sustained. Please refrain from using such language.".

In support of his argument that the defendant was prejudiced by these remarks by the court, appellant relies on *Commonwealth v. Stallone*, 281 Pa. 41, 126 A. 56. In that case the trial judge in a heated exchange with defense counsel stated: " 'You have no right to lecture the court and I want you to cut it out. I have taken all I am going to take from you.' ". In that case this Court said: "The record indicates that during the course of the trial there was quite a display of feeling between the trial judge and counsel for defendant.". That was clearly not the situation in the instant case. A reading of the entire transcript of testimony, which consisted of 1068 typewritten pages, discloses that the trial judge throughout the trial afforded full consideration and courtesy to defense counsel and took every precaution to protect the interests of the defendant. The isolated

remarks of the trial judge referred to by appellant do not show any animosity on the part of the court toward defense counsel, or any lack of judicial impartiality toward defendant, as was revealed in *Commonwealth v. Stallone,* supra.

Appellant's complaint that the court unduly limited his counsel in the cross-examination of the Commonwealth's witnesses is entirely without merit. We have carefully examined the record with respect to this complaint and are fully satisfied that the court did not abuse its discretion by imposing any unreasonable limitation upon counsel's right to cross-examine.

Appellant's third contention is that the court erred in permitting a witness for the Commonwealth (Mrs. Berdette) to testify as to a telephone conversation she had with Dr. Shaffer. Mrs. Berdette testified to the effect that Dr. Shaffer told her that defendant was wanted in Pennsylvania on a very serious charge and advised her to try to hold him. If the admission of this telephone conversation was error, it was entirely harmless. The jury was already aware that defendant had been charged with a serious crime and Mrs. Berdette also testified that defendant a few minutes later told her that he had killed a man by shooting him five times.

The fourth contention is that the trial court erred in admitting into evidence five of defendant's confessions. Appellant argues that the three written confessions and the two oral confessions respectively made to Guy Wetzel and Henry Davis were all coerced. Appellant does not contend that these confessions or the facts stated therein are not true. No argument is made concerning the admissibility of defendant's original confession to Mrs. Berdette wherein he told her that he killed a man by shooting him five times.

There is no testimony whatever to indicate that any of the confessions were coerced by means of physical abuse, threats or prolonged questioning. The testimony

of the Commonwealth's witnesses is distinctly to the contrary. Appellant asked the court below and now asks this Court to infer coercion from the circumstances surrounding each of these confessions and relies principally on *Haley v. Ohio*, 332 U. S. 596; *Watts v. Indiana*, 338 U. S. 49 and *Turner v. Pennsylvania*, 338 U. S. 62. Each of the Hattiesburg confessions begin with the statement: ". . . I have been informed of my rights and I know that anything I say may be used against me in a Court of Law. I am making this statement of my own free will and accord with no threat or promise of reward for making same.". The confession made by defendant at the Clarion Police Station begins: " 'BY MR. SYKES: Now, Donald, I would like to have you answer some questions here and are you willing to answer some questions here for us. Donald? Now, before you answer any of these questions it is my duty to inform you and I want to inform you that you don't have to answer anything you don't want to, you have the Constitutional right to that—to say nothing. Now, knowing that, are you still willing to give us a statement? A. If I find it fit to the question, why I will.".

The period of time taken to complete each of the Hattiesburg confessions was only one hour, including the time required to type the statements made by defendant. The period of questioning for the Clarion confession was fifty minutes. Defendant's oral confessions on June 14, 1951 to Wetzel, a county employe, and on October 17, 1951 to Davis, a local police officer, were not preceded by any questioning and in view of the other circumstances surrounding these oral confessions, particularly the fact that defendant confessed to Davis after he sent word to Davis that he wanted to talk to him, it clearly appears that these confessions were voluntary. None of the five confessions can be said to have been coerced as a result of prolonged questioning as was the situation in the cases relied upon by appel-

lant. In *Haley v. Ohio*, supra, the 15 year old defendant was questioned by relays of police from 12 o'clock midnight to 5:00 A.M. and after the confession was made, counsel retained by defendant's mother was twice refused permission to see him by the police. In *Watts v. Indiana*, supra, the defendant was questioned by relays of police over a period of seven days, some periods of questioning extending until 3 o'clock in the morning. In *Turner v. Pennsylvania*, supra, the defendant was also questioned by relays of police during the day as well as at night, for a period of five days.

Appellant's principal argument that defendant's first and second written confessions were coerced stems from the fact that the confessions were made to police officers, that the defendant was then only 16 years old, was 1,200 miles from home, was dirty, tired and nervous, in an upset emotional state and without counsel. The fact that a confession is made while a prisoner is in the custody of armed police officers will not render it involuntary: *Commonwealth v. Jones*, 341 Pa. 541, 548, 19 A. 2d 389, nor is a confession invalidated because the accused was not represented by counsel, no request for such representation having been made: *Commonwealth v. Bryant*, 367 Pa. 135, 145, 79 A. 2d 193. Appellant's youth, distance from home and nervous condition at the time he made his first written confession does not of itself render the confession inadmissible, particularly where the confession is corroborated by other evidence. Cf. *Commonwealth v. Cavalier*, 284 Pa. 311, 131 A. 229. These are facts to be taken into consideration by the jury in determining whether or not the confessions were voluntary and the jury was so instructed by the court in its charge: See *Commonwealth v. Spardute*, 278 Pa. 37, 122 A. 161.

Appellant's argument that defendant's third confession was coerced is based on the circumstances that the interrogation started immediately after defendant and

the two police officers arrived at Clarion, Pennsylvania at about midnight on June 9, 1951, immediately following a 1,200 mile automobile trip from Hattiesburg, Mississippi. A confession which resulted from only fifty minutes of questioning and which was merely a more detailed statement of three confessions already made at the time, and after the prisoner was informed of his constitutional right to remain silent, cannot be said to be the result of mental torture within the meaning of cases decided by this Court or by the United States Supreme Court. Appellant's contention that five of the six confessions introduced into evidence were coerced cannot be sustained.

The fifth contention is that the trial court erred in refusing to withdraw a juror because of a volunteered answer by one of the Commonwealth's witnesses. During the interrogation of State Police Officer Lepley who was present when the second written confession was made, after the witness had testified that the defendant had signed it, the district attorney asked "Was there any question asked him before he signed it?". The witness answered: "I asked him if it was correct and he said it was.". Defense counsel asked the answer be stricken from the record and the jury instructed to disregard it and also moved to withdraw a juror. The court instructed the jury to disregard the question and answer and further instructed the witness not to volunteer answers of that nature, but refused to withdraw a juror. There was clearly no error on the part of the court in this respect and this contention of the appellant is utterly without merit.

Appellant's sixth contention is that the trial court erred in permitting police officers to give opinions as to their treatment of the defendant. The questions objected to by the appellant are as follows: Officer Lepley was asked, "Q. Now enroute from Mississippi to Clarion did you, Sheriff Shaffer, or anyone else, abuse Donald

Smith physically in any way? A. Not to my knowledge. . . Q. From your observation while Donald Smith was in your presence and your custody, from your observation was he physically ill-treated in any way? [Objection by defense counsel overruled]. A. He was not.". Sheriff Shaffer was asked: "Q. . . . Did you permit him to visit service stations or comfort stations? A. I can answer that one, any of his wants he had on anything he was well taken care of.". [Objection and motion to strike overruled]. Officer Shaginaw was asked, "Q. Did anyone restrain him [the defendant]?". [Objection overruled]. "A. No, he wasn't restrained. He walked over himself.". The objections by defendant's counsel to all of these questions were on the ground that they elicited conclusions. There was no objection to the leading nature of the questions. We are unable to find that the defendant was harmed in any way by the above quoted questions and the answers thereto.

The seventh contention is that the trial court erred in permitting a witness to give an oral opinion as to the contents of one of the written confessions and that this was a violation of the best evidence rule. The question referred to was directed to Officer Vinson, as follows: "Q. Will you examine the statement and tell the Court and the jury whether or not the things that appear in this statement are the things that the defendant told Officer Jones in your presence?". After an objection was overruled, the witness answered: "A. With the exception of 'page 64' and 'File No. 1-C-26-35' [which were added by the Pennsylvania State Police] that wasn't on at the time that the statement was taken.". Officer Vinson was one of the Hattiesburg police officers who was present at the time defendant made his first written confession. He was called as a witness, inter alia, for the purpose of proving that confession preparatory to its introduction into evidence. Officer Vinson testified to the events which occurred prior to the time

the confession was typed and signed by the defendant, identified Commonwealth Exhibit 48 as the statement taken from defendant in his presence, stated that the confession was read by defendant and signed by him and identified the signatures of the witnesses to the confession. He was then asked the above quoted question to which defense counsel objected on the ground that the answer would violate the best evidence rule. The answer of Officer Vinson does not constitute testimony as to the content of the confession. It simply completes the identification of the confession and states in effect that aside from administrative identification markings, the confession is in the same condition as it was when it was taken. The witness did not orally repeat any statement or confession made by the defendant. At any rate, the entire confession was shortly thereafter admitted into evidence so that this alleged error could not possibly have harmed the defendant since the jury was able to examine the entire content of the confession itself. There is no merit in this contention of the appellant.

Appellant's eighth contention is that the trial court erred in refusing to affirm defendant's requests for charge. Defendant submitted nine requests for charge and the court affirmed only one, the third request. The other eight were denied. Appellant's first request concerned the presumption of innocence. The sixth request was for an instruction that the burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant is guilty of murder in the first degree. The second, seventh and eighth requests concerned the defense of insanity. All of the points set out in these requests had been elaborately considered by the court in its general charge and there was no error in its refusal to repeat them: *Commonwealth v. Weston*, 297 Pa. 382, 147 A. 79; *Commonwealth v. Zietz*, 364 Pa. 294, 298, 72 A. 2d 282.

The fourth request for charge was as follows: "If the jury finds from the evidence beyond a reasonable doubt that the defendant shot the deceased but that the defendant did not form the intention of shooting the deceased until immediately prior to pulling the trigger on the gun, such killing was not perpetrated by lying in wait.". The fifth request was: "If the jury finds from the evidence beyond a reasonable doubt that the defendant shot the deceased and that the defendant did not at the time of pulling the trigger on the gun intend to kill the deceased, such killing was not wilful, deliberate and premeditated.". At the trial these requests were refused because their subject matter was covered in the charge. In the opinion of the lower court the reason is also given that the language of the requests was inexact because five shots were fired and the requests did not show to which shot the request referred. It is unnecessary to decide whether or not the latter reason was sufficient to justify the refusal to affirm the requests. The gist of these two requests for charge is that the jury be instructed that in order to convict defendant of murder in the first degree they must find that he had formed the intention to kill McConnell prior to the time he fired the five shots into his body. The court charged: "An instant of time may be all the time necessary for one to form a determination to do a certain thing, so swift is the operation of the human mind. If there is a previous deliberation or previous intent to kill, however sudden and however quickly put into execution, the act is premeditated. The deliberation and premeditation required is not upon the intent but upon the killing. An intent distinctly formed, even for a moment before being carried into execution is sufficient. No time is too short for a wicked man to frame in his mind his scheme of murder and to contrive his means of accomplishing it. But this expression must be qualified, lest it mislead. It is true that such is the swiftness of human thought,

that no time is so short in which a wicked man may not form a design to kill and frame the means of executing his purpose; yet, this suddenness is opposed to pre-meditation, and a jury must be well convinced upon the evidence that there was time to deliberate and pre-meditate. The law requires, and you must find, the actual intent—the fully formed purpose to kill, with so much time for deliberation and premeditation as to convince you that this purpose is not the immediate offspring of rashness and impetuous temper, and that the mind has become fully conscious of its own design. . . That type of murder denoted as first degree and de-scribed as murder by lying in wait is self-explanatory. That is where one person lies in ambush or secretes him-self and awaits an opportunity to take the life of his victim. The law says there are three elements neces-sary to constitute the crime of murder in the first degree by lying in wait. They are: First, waiting; second, watching; and, third, secrecy. If a person waits and watches an opportunity to kill another, and by secrecy it does not mean that he necessarily secretes or hides him-self but that he formed in his own mind the secret in-tention to take the life of his victim—if those three elements are present and are established to the satis-faction of the jury, and life is taken under those cir-cumstances the man who takes the life is guilty of mur-der in the first degree by lying in wait. . . The law presumes that when a man uses a deadly weapon, such as a gun, a number of times, as by shooting more than once, he has more time to consider the circumstances and to form an intention to kill and his mind is more likely to be fully conscious of the design to kill. How-ever, you must determine the intent from all the evidence in the case. . . If at the time he took the life he thought of his purpose to kill him and had time to think that he would execute it, and formed fully in his mind the conscious design of killing, and had time to think of the

weapon he had prepared and that he would use it, and accordingly did use it, it would be murder in the first degree. But though he had prepared and carried the weapon, intending to use it, if at the time he had no real intention of killing Otto R. McConnell and did not deliberate on his act, but in the suddenness of the occasion and the impetuousness of his temper he intended only to wound or do great bodily harm to him, it would be murder of the second degree only.".

It thus appears that the subject matter of the appellant's fourth and fifth requests for charge had been covered by the court, and there was no error in its refusal to repeat those instructions. *Commonwealth v. Weston,* supra; *Commonwealth v. Zietz,* supra.

The ninth request for charge was the customary request for a directed verdict for the defendant and was properly refused.

Appellant's ninth contention is that the trial court erred in admitting into evidence photographs of the deceased. The court admitted into evidence four photographs of the deceased taken at the scene of the crime and three photographs of the head and shoulders of the deceased. Appellant contends that the admission of such photographs was not necessary and could only tend to inflame the minds of the jury. When Dr. Shaffer who performed an autopsy on the deceased was on the stand, he testified that the photographs would aid, supplement and explain his testimony. They were offered for that purpose. At the time they were admitted, the court cautioned the jury not to permit the photographs to influence or prejudice them against the defendant and explained why they were being admitted. In the charge the court again repeated his instructions with reference to the photographs. This Court has held in many cases that photographs of a deceased person are admissible for the purposes for which these photographs were offered. See, for example, *Commonwealth v.*

*Wentzel,* 360 Pa. 137, 148, 61 A. 2d 309; *Commonwealth v. Simmons,* 361 Pa. 391, 397, 398, 65 A. 2d 353. The fact that the jury brought in a verdict of guilty and fixed the punishment at life rather than death is an indication that the photographs did not have the effect that the appellant fears they might have had.

A reading of the entire record in this case assures us that the defendant received a fair trial and that the court was guilty of no reversible error. The jury in our opinion having properly rejected the defense of insanity, its finding that the defendant was guilty of murder of the first degree, was, under the evidence, the only one which could have been returned by a jury deliberating under a proper sense of duty.

Judgment and sentence affirmed.