**C.F., Petitioner,**

v.

**PENNSYLVANIA DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 13, 2002.

Decided Aug. 14, 2002.

Jonathan Krinick, Philadelphia, for petitioner.

Tara Matusow, Philadelphia, for intervenor, Phila. County Dept. of Human Services.

Before LEADBETTER, Judge, and LEAVITT, Judge, and DOYLE, Senior Judge.

OPINION BY Judge LEAVITT.

C.F. (Appellant) petitions for review of an adjudication of the Department of Public Welfare (DPW) denying her request to expunge a report of indicated child abuse filed by a caseworker for the Philadelphia Department of Health and Human Services pursuant to the Child Protective Service Law (Law).[1] We reverse.

The facts are not in dispute. On the morning of November 29, 1993, Appellant placed her ten and a half month old son, J.M., on the top level of a bunk bed located in the bedroom of their house. She left J.M. on the bed and went downstairs to prepare a bottle of milk. About fifteen minutes later, Appellant returned to the bedroom with the bottle and found J.M. stuck with his head between the edge of the mattress and the bed frame; his legs were dangling over the side.

Immediately, Appellant sought help from her boyfriend (and father of J.M.) who worked across the street at a pizza shop; he called the police.[2] J.M. was taken to St. Christopher's Hospital in Philadelphia where he was pronounced dead.

On November 30, 1993, a caseworker for the Philadelphia Department of Health and Human Services (Health and Human Services), Ronald B. Pearson (Pearson), visited Appellant's home, interviewed Appellant and inspected the bunk bed where the incident occurred. Pearson produced a written report of his observations noting that Appellant's house was neat and clean and that the family seemed to be supportive of one another. Nevertheless, Pearson's report concluded that Appellant had committed child abuse by leaving J.M. on the top bunk alone for fifteen minutes. Accordingly, on December 23, 1993, Pearson filed an indicated report of child abuse against Appellant.

On March 24, 1994, the Office of Medical Examiners (Medical Examiner) concluded the examination of J.M. and circumstances surrounding his death. The Medical Examiner found that J.M. had died from acute anoxia (sudden lack of oxygen) encephalopathy (to the brain) resulting in mechanical asphyxia (respiratory failure, lack of oxygen). There was no evidence of trauma, and the toxicology and histology results were negative. As a result, the Medical Examiner reported the cause of death as accidental.

---

1. 23 Pa.C.S. §§ 6301–6385.

2. Although Appellant cannot recall, she stated that she must have removed J.M. from the bed at this time. Reproduced Record, 12a. (hereinafter R.R.).

On September 20, 2000, Appellant filed an appeal of the indicated finding of child abuse and requested that the records concerning the allegations of child abuse be expunged from the ChildLine Registry.[3] After conducting a hearing, the hearing officer concluded that the records should be expunged. On February 13, 2001, the Regional Director of the Bureau of Hearings and Appeals of DPW adopted the recommendation of the hearing officer to expunge the records.

On February 23, 2001, Health and Human Services filed an Application/Petition for Reconsideration of the Regional Director's order. On August 9, 2001, the Secretary of Public Welfare (Secretary) granted the reconsideration and set aside the February 13, 2001 order of the Regional Director. Appellant petitioned for review of the Secretary's adjudication seeking to have the record of indicated child abuse expunged.[4]

On appeal, Appellant contends that the Secretary erred in her adjudication. Appellant asserts that the death of her child was an accident, which was the specific finding of the Medical Examiner, and not intentional as required in a finding of child abuse. Further, Appellant contends that leaving J.M. for fifteen minutes does not constitute "serious physical neglect." We agree.

The Law defines an "indicated report" as follows:

A child abuse report made pursuant to this chapter if an investigation by the county agency or the Department of Public Welfare determines that substantial evidence [5] of the alleged abuse exists based on any of the following:

(1) Available medical evidence.

(2) The child protective service investigation.

(3) An admission of the acts of abuse by the perpetrator.

23 Pa.C.S. § 6303. The county agency bears the burden of proving in an expungement case that the actions of the perpetrator constitute child abuse within the meaning of the statute. The county's evidence must outweigh any contrary evidence. *B.J.K. v. Department of Public Welfare*, 773 A.2d 1271 (Pa.Cmwlth.2001).

The subject of the indicated report, "child abuse," is defined in the Law is as follows:

(b) **Child abuse.**

(1) The term **"child abuse"** shall mean any of the following:

---

**3.** ChildLine is a unit of the DPW that operates a Statewide toll free system for receiving reports of suspected child abuse, refers the reports for investigation and maintains the reports in the appropriate file. 55 Pa.Code § 3490.4; 23 Pa.C.S. § 6332. A report of suspected child abuse by the appropriate county agency can be "found" or "indicated." In either case, the information concerning suspected child abuse is removed immediately from the pending complaint file and placed in the statewide central register. After the report is placed in the statewide central registry, the perpetrators must be notified that their ability to obtain employment in a childcare facility or school may be adversely affected. 23 Pa.C.S. § 6338. The Law provides that the reports of child abuse may be made

available to certain individuals such as: county agency officials, physicians, the Attorney General, federal auditors, and the district attorney. 23 Pa.C.S. § 6340.

**4.** Appellate review of this matter is limited to determining whether constitutional rights were violated, whether errors of law were committed or whether necessary findings of fact are supported by substantial evidence. *P.R. v. Department of Public Welfare*, 759 A.2d 434 (Pa.Cmwlth.2000).

**5.** Substantial evidence is "evidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." 23 Pa.C.S. § 6303.

*(i) Any recent act or failure to act by a perpetrator which causes nonaccidental serious physical injury[6] to a child under 18 years of age.*

(ii) An act or failure to act by a perpetrator which causes nonaccidental serious mental injury to or sexual abuse or sexual exploitation of a child under 18 years of age.

(iii) Any recent act, failure to act or series of such acts or failures to act by a perpetrator which creates an imminent risk of serious physical injury to or sexual abuse or sexual exploitation of a child under 18 years of age.

*(iv) Serious physical neglect by a perpetrator constituting prolonged or repeated lack of supervision or the failure to provide the essentials of life, including adequate medical care, which endangers a child's life or development or impairs the child's functioning.*

23 Pa.C.S. § 6303(b)(*l*)(i)-(iv) (emphasis added). This case turns on whether leaving an infant unattended in a bunk bed constitutes "child abuse" under the first or fourth definition set forth above.

Appellant contends that she did not abuse J.M. under the first definition of child abuse because the death of her child was accidental. Although the Law does not define the term "accidental," in *P.R. v. Department of Public Welfare*, 801 A.2d 478 (Pa.2002),[7] our Supreme Court addressed the challenge of differentiating between child abuse and accidental injury. If a child's injury is nonaccidental then it is considered child abuse. To determine whether an injury is nonaccidental, the Court has directed that we apply the criminal negligence standard, which is defined as follows:

A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. *The risk must be of such a nature and degree that the actor's failure to perceive it,* considering the nature and intent of his conduct and the circumstances known to him, *involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.*

*P.R.*, 801 A.2d 478 (emphasis added).

Here, Appellant could not predict that her ten and-a-half month old child would die when she left him on a bunk bed to prepare his bottle. J.M's death was an accident; this was the express conclu-

---

**6.** Serious physical injury is defined as, "an injury that: (1) causes a child severe pain; or (2) significantly impairs a child's physical functioning, either temporarily or permanently." 23 Pa.C.S. § 6303.

**7.** In *P.R.*, Appellant had struck her daughter, D.N., in the eye with a belt while attempting to discipline her. When Appellant went to spank D.N. on the buttocks with the belt, D.N., in an effort to avoid being struck, ducked and turned which resulted in D.N. being struck in the eye with the belt buckle. Appellant alleged that it was not child abuse because it was an accident; she did not intend to cause injury to D.N.'s eye. The Court reasoned that in most circumstances the deci-

sion to use a belt that bears a buckle cannot be viewed as a gross deviation from the standard of care a reasonable parent would observe in the same situation. Accordingly, the Court concluded that Appellant had accidentally injured D.N.

The Supreme Court was faced with a case different from the one before us. *P.R.* sought to establish some clarity in the law, which permits parents to discipline their children but not to the point of excess; the Court sought to sort out the "tension" between these two objectives. Here, Appellant was not seeking to discipline J.M.; she was trying to prepare his bottle and left him unattended while she set about that task.

of the Medical Examiner. Further, the Medical Examiner found no evidence of trauma prior to the child's death. R.R. 31a. It was not a foreseeable risk that J.M. would die if left alone for fifteen minutes, and Appellant's failure to perceive that risk did not involve a "gross deviation from the standard of care that a reasonable person would observe" in her situation. In short, Appellant's conduct does not meet the definition of child abuse set forth at 23ˆPa.C.S. § 6303(b)(*l*)(i), which only targets "nonaccidental" events.

■ Next, Appellant contends that leaving J.M. on the bed for fifteen minutes *does not constitute serious physical neglect* as set forth in 23 Pa.C.S. § 6303(b)(*l*)(iv). We agree.

■ "Serious physical neglect" is defined in DPW's regulation as follows:

A physical condition caused by the act or failure to act of a perpetrator which endangers the child's life or development or impairs the child's functioning and is the result of one of the following:

(i) *Prolonged or repeated lack of supervision.*

(ii) Failure to provide the essentials of life, including adequate medical and dental care.

55 Pa.Code § 3490.4 (emphasis added). It essentially restates 23 Pa.C.S. § 6303(b)(1)(iv). Neither the statute nor the regulation define "prolonged" or "repeated." Where a term is not defined, the Statutory Construction Act of 1972 directs that "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage...." 1 Pa.C.S. § 1903(a). In ascertaining the common and approved usage or meaning, this Court will look to the dictionary definition of a term left undefined by the legislature. *P.R.*, 759 A.2d at 437.

"Prolong" is defined as, "1. To lengthen in duration: PROTRACT. 2. To lengthen in scope or extent." Webster's II New College Dictionary (1995). "Repeat" is defined, in relevant part, as: "1. An act of repeating. 2. Something repeated;" "repeated" is defined as, "Said, done, or occurring again and again." *Id.*

■ To constitute a repeated lack of supervision under the Law, the perpetrator must leave the child unsupervised more than once.[8] Here, Appellant left J.M. alone on one occasion; this is not "repeated." The only remaining issue, then, is whether Appellant left J.M. alone long enough to constitute a "prolonged" lack of supervision.

Although no cases have addressed what "prolonged" means under the Law, the Pennsylvania Supreme Court has considered what "prolonged" means in the context of police questioning. *Commonwealth v. Smith*, 374 Pa. 220, 97 A.2d 25 (1953).[9]

---

**8.** Courts have generally defined the term "repeat" to include at least two incidents. In *Johnson v. Indiana*, 721 N.E.2d 327 (Ind.App. 1999), the court held that for acts of harassment to be "repeated," thus prohibited under anti-stalking law, acts must occur more than once. In *South Dakota v. Diede*, 319 N.W.2d 818 (S.D.1982), the court held that the word "repeated" as used in a statute making it unlawful to make repeated anonymous telephone calls with intent to·disturb any person means merely more than one call. In *Commonwealth v. Wotan*, 422 Mass. 740, 665 N.E.2d 976 (1996), however, the court noted that the term "repeat" is ambiguous because some dictionaries define it as "again and again" whereas others define the term "more than once." Thus, the *Wotan* Court concluded that the defendant had to make at least three harassing telephone calls to violate a statute making it a misdemeanor to telephone someone repeatedly solely to harass or annoy.

**9.** Courts have construed the term "prolonged" on a case-by-case basis. For instance, in *Miller v. Fenton*, 796 F.2d 598 (3d. Cir.1986), the Third Circuit held that a police

In *Smith*, the Court examined whether defendant who confessed to murder on five different occasions for the same murder did so voluntarily. A confession made after "prolonged" questioning may be found involuntary and, thus, inadmissible. In *Smith*, the defendant was not questioned for more than an hour on any of the five occasions. In addition, there was no physical abuse involved in the questioning, and each of the defendant's signed confessions indicated that he had been informed of his right to remain silent.

The Supreme Court compared these facts to those in three cases where the police had engaged in "prolonged" questioning that resulted in involuntary confessions. In *Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), police questioned a fifteen-year-old, in relays of one or two each, for five hours until 5:00 a.m., and they refused to allow him to speak with his attorney. In *Watts v. Indiana*, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949), the police interrogated the defendant for six days, throughout the nights, and in *Turner v. Pennsylvania*, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949), the police interrogated defendant, day and night, for five days.

After reviewing these cases, the Court concluded that questioning the defendant one hour on five separate occasions was not "prolonged" questioning. Based on the totality of the circumstances, the Court concluded that his confession was voluntary.

Following this approach of the Pennsylvania Supreme Court, we consider the totality of the circumstances of this case. Appellant left J.M., a ten and-a-half month old child, alone for fifteen minutes on a bunk bed while she prepared his bottle. Ironically, the reason for her absence was to attend to J.M.'s "essentials of life." Her home was clean and neat, and her family was supportive as found by Pearson's report. R.R. 13a. Appellant was 17 years old. Her child showed no signs of neglect, such as being underweight, or of having suffered trauma.[10] Looking at all these circumstances, we cannot conclude that J.M. was the victim of "prolonged or repeated lack of supervision" or that Appellant committed "serious neglect." Her action was not wise, and it resulted in a

interrogation lasting less than in hour, given the totality of the circumstances, did not constitute a "prolonged" interrogation resulting in an involuntary confession.

Further, in *In re Denton*, 326 Or. 236, 951 P.2d 693 (1998), the Court construed an Oregon statute to determine whether the wife's contribution to the husband's medical license was sufficiently "prolonged" to entitle her to an equitable portion of the husband's enhanced earning capacity resulting from that license as part of the property distribution. The wife supported her husband for years as he attempted to get accepted into medical school, attended medical school, and completed his residency; therefore, the Court held that the wife was entitled to the equitable portion.

Also, in *Texas Municipal Power Agency v. Environmental Protection Agency*, 89 F.3d 858 (D.C.Cir.1996), the Court affirmed the Environmental Protection Agency's conclusion that the term "prolonged" located in Section 402(4)(A) of the Clean Air Act Amendments, means three months; the Court held that the Administrator may adjust a facility's emission allowances under if an outage lasts at least three months. In so holding, the Court explained that the common meaning of prolonged denotes *an extended duration* but what qualifies as extended is not a fixed term.

In short, "prolonged" is defined according to the context in which it is used in the statute.

10. Had J.M. suffered falls from periods of "prolonged" lack of supervision, trauma would have resulted but none was found in the autopsy.

dreadful accident;[11] but it was not child abuse as set forth in 23 Pa.C.S. § 6303(b)(1)(iv).

Accordingly, we reverse the adjudication of the Department of Public Welfare.

## ORDER

AND NOW, this 14th day of August, 2002, the order of the Department of Pub-

lic Welfare dated August 9, 2001 in the above-captioned matter is hereby reversed and the record of C.F. ordered expunged.

11. In some situations it may be that leaving a child alone for fifteen minutes could be considered a prolonged lack of supervision. For example, a perpetrator may be found to have committed child abuse by leaving a young child in a swimming pool alone for fifteen minutes or alone in a hot car all day. Leaving a child unattended in a swimming pool or hot car may, in fact, constitute intentional, or "nonaccidental," child abuse under 23 Pa. C.S. § 6303(b)(*l*)(i). Appellant makes the argument that accidental harm is never child abuse. Under our Supreme Court's holding in *P.R.*, the examples cited above would likely constitute criminal negligence and, thus, meet the definition of nonaccidental child abuse.